**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| [UNDER SEAL], | § | ORIGINAL COMPLAINT FOR |
| | § | VIOLATIONS OF FEDERAL |
| Plaintiffs, | § | FALSE CLAIMS ACT |
| | § | |
| | § | **FILED UNDER SEAL** |
| | § | PURSUANT TO 31 U.S.C. |
| v. | § | § 3730(b)(2) |
| | § | |
| | § | DO NOT PUT ON PACER |
| | § | |
| | § | DO NOT PLACE IN PRESS |
| [UNDER SEAL], | § | BOX |
| | § | |
| Defendants. | § | <u>JURY TRIAL DEMANDED</u> |

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* Clarisse Christine Toledo,<br><br>  Plaintiffs,<br><br>v.<br><br>HCA HOLDINGS, INC.; BAY HOSPITAL,<br>INC., D/B/A GULF COAST REGIONAL<br>MEDICAL CENTER; BAYSHORE MEDICAL<br>CENTER, INC.; BAY VIEW<br>REHABILITATION AT MERCY HOSPITAL;<br>CENTRAL FLORIDA REGIONAL HOSPITAL,<br>INC.; CENTRAL TENNESSEE HOSPITAL<br>CORPORATION, D/B/A TRISTAR HORIZON<br>MEDICAL CENTER; CHIPPENHAM &<br>JOHNSTON-WILLIS HOSPITALS, INC., D/B/A<br>JOHNSTON-WILLIS HOSPITAL; CLEAR<br>LAKE REGIONAL MEDICAL CENTER, INC.;<br>COLISEUM HEALTH GROUP, INC.;<br>COLISUM NORTHSIDE HOSPITAL;<br>COLISEUM REHABILITATION CENTER;<br>COLLETON MEDICAL ARTS, LLC D/B/A<br>COLLETON MEDICAL CENTER;<br>COLUMBIA/ALLEGHANY REGIONAL<br>HOSPITAL, INC., D/B/A LEWISGALE<br>HOSPITAL ALLEGHANY; COLUMBIA<br>GOOD SAMARITAN HEALTH SYSTEM L.P.,<br>D/B/A GOOD SAMARITAN HOSPITAL;<br>COLUMBIA/HCA JOHN RANDOLPH, INC.,<br>D/B/A JOHN RANDOLPH MEDICAL<br>CENTER; CONROE MEDICAL CENTER, LLC,<br>D/B/A CONROE REGIONAL MEDICAL<br>CENTER; CORPUS CHRISTI MEDICAL<br>CENTER – DOCTORS REGIONAL; DOCTORS<br>HOSPITAL OF AUGUSTA, LLC; EASTERN<br>IDAHO HEALTH SERVICES, INC., D/B/A<br>EASTERN IDAHO REGIONAL MEDICAL<br>CENTER; EAST JEFFERSON GENERAL<br>HOSPITAL; EASTSIDE MEDICAL CENTER, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | RELATOR CLARISSE<br>CHRISTINE TOLEDO'S<br>ORIGINAL COMPLAINT<br><br><br><br>**FILED UNDER SEAL**<br>PURSUANT TO 31 U.S.C. §<br>3730(b)(2)<br><br><br><br>JURY TRIAL DEMANDED |

LLC; EL PASO HEALTHCARE SYSTEM,                §
LTD., D/B/A LAS PALMAS                          §
REHABILITATION HOSPITAL; FAWCETT                §
MEMORIAL HOSPITAL, INC.; FORT                   §
WALTON BEACH MEDICAL CENTER, INC.;              §
GALEN HOSPITAL ALASKA, INC., D/B/A              §
ALASKA REGIONAL HOSPITAL; GRAND                 §
STRAND REGIONAL MEDICAL CENTER,                 §
LLC; GULF COAST DIVISION, INC.; HCA-            §
HEALTHONE, LLC; HCA HEALTH                       §
SERVICES OF FLORIDA, INC., D/B/A BLAKE          §
MEDICAL CENTER; HCA HEALTH                       §
SERVICES OF NEW HAMPSHIRE, INC.,                §
D/B/A PARKLAND MEDICAL CENTER; HCA              §
HEALTH SERVICES OF OKLAHOMA, INC.;              §
HCA HEALTH SERVICES OF VIRGINIA,                §
INC., D/B/A PARHAM DOCTORS'                      §
HOSPITAL; HENDERSONVILLE HOSPITAL               §
CORPORATION, D/B/A TRISTAR                       §
HENDERSONVILLE MEDICAL CENTER;                  §
HOUSTON NORTHWEST MEDICAL                        §
CENTER, INC.; HTI MEMORIAL HOSPITAL             §
CORPORATION, D/B/A TRISTAR SKYLINE              §
MEDICAL CENTER; KENDALL                          §
HEALTHCARE GROUP, LTD., D/B/A                    §
KENDALL REGIONAL MEDICAL CENTER;                §
KINGWOOD MEDICAL CENTER, LLC;                    §
LARGO MEDICAL CENTER, INC.;                      §
LAWNWOOD MEDICAL CENTER, INC.,                   §
D/B/A LAWNWOOD PHYSICAL                          §
REHABILITATION CENTER; LEWISGALE                §
MEDICAL CENTER, LLC; LOS ROBLES                  §
REGIONAL MEDICAL CENTER MOB, LLC,               §
D/B/A LOS ROBLES HOSPITAL & MEDICAL             §
CENTER; MAINLAND MEDICAL CENTER,                §
INC.; MARION COMMUNITY HOSPITAL,                §
INC., D/B/A OCALA REGIONAL MEDICAL              §
CENTER; MEDICAL CITY ARLINGTON;                 §
MEDICAL CITY DALLAS HOSPITAL, INC.,             §
D/B/A MEDICAL CITY HOSPITAL;                     §
MEDICAL CITY FORT WORTH; MEDICAL                §
CITY LEWISVILLE; METHODIST                       §
HEALTHCARE SYSTEM OF SAN ANTONIO,               §
LLP; METHODIST HOSPITAL;                         §
METROPOLITAN METHODIST HOSPITAL;                §
MIDAMERICA DIVISION, INC., D/B/A                 §

WOMEN'S & CHILDREN'S HOSPITAL;                  §
MIDWEST DIVISION – MMC, LLC, D/B/A               §
MENORAH MEDICAL CENTER; MIDWEST                  §
DIVISION – RMC, LLC, D/B/A RESEARCH              §
MEDICAL CENTER; MONTGOMERY                       §
REGIONAL HOSPITAL, INC., D/B/A                   §
LEWISGALE HOSPITAL MONTGOMERY;                   §
MOUNTAINSTAR MEDICAL GROUP –                     §
CACHE VALLEY, LLC, D/B/A CACHE                   §
VALLEY HOSPITAL; MOUNTAINSTAR                    §
MEDICAL GROUP – OGDEN REGIONAL                   §
MEDICAL CENTER, LLC; MOUNTAINSTAR                §
MEDICAL GROUP – ST. MARK'S HOSPITAL,             §
LLC; MOUNTAIN VIEW HOSPITAL, INC.,               §
D/B/A MOUNTAIN VIEW HOSPITAL –                   §
PAYSON; NEW PORT RICHEY HOSPITAL,                §
INC., D/B/A MEDICAL CENTER OF TRINITY;           §
NORTH FLORIDA REGIONAL MEDICAL                   §
CENTER, INC.; NORTH TEXAS DIVISION,              §
INC., D/B/A MEDICAL CITY HEALTHCARE;             §
NOTAMI HOSPITALS OF FLORIDA, INC.,               §
D/B/A LAKE CITY MEDICAL CENTER;                  §
OKEECHOBEE HOSPITAL, INC., D/B/A                 §
RAULERSON HOSPITAL; ORANGE PARK                  §
MEDICAL CENTER, INC.; OU MEDICAL                 §
CENTER; OU MEDICAL CENTER EDMOND;                §
PARKRIDGE MEDICAL CENTER, INC.;                  §
PLANTATION GENERAL HOSPITAL;                     §
PLANTATION GENERAL HOSPITAL L.P.;                §
PRESBYTERIAN/ST. LUKE'S MEDICAL                  §
CENTER; PUTNAM COMMUNITY MEDICAL                 §
CENTER OF NORTH FLORIDA, LLC;                    §
REDMOND PARK HOSPITAL, LLC, D/B/A                §
REDMOND REGIONAL MEDICAL CENTER;                 §
RIO GRANDE REGIONAL HOSPITAL, INC.;              §
SAN JOSE MEDICAL CENTER, LLC, D/B/A              §
REGIONAL MEDICAL CENTER OF SAN                   §
JOSE; SARASOTA DOCTORS HOSPITAL,                 §
INC., D/B/A DOCTORS HOSPITAL OF                  §
SARASOTA; SOUTH ATLANTIC DIVISION,               §
INC., D/B/A FAIRVIEW PARK HOSPITAL;              §
SPALDING REHABILITATION HOSPITAL;                §
ST. DAVID'S GEORGETOWN HOSPITAL; ST.             §
DAVID'S HEALTHCARE PARTNERSHIP,                  §
LLP; ST. DAVID'S NORTH AUSTIN                    §
MEDICAL CENTER; ST. DAVID'S                      §

REHABILITATION HOSPITAL; ST. DAVID'S §
ROUND ROCK MEDICAL CENTER; §
SUNRISE HOSPITAL & MEDICAL CENTER, §
LLC; SUNRISE MOUNTAINVIEW §
HOSPITAL, INC., D/B/A MOUNTAINVIEW §
HOSPITAL; SWEDISH MEDICAL CENTER; §
TERRE HAUTE REGIONAL HOSPITAL, L.P.; §
TOMBALL REGIONAL MEDICAL CENTER; §
TRISTAR ASHLAND CITY MEDICAL §
CENTER; TRISTAR CENTENNIAL MEDICAL §
CENTER; TRISTAR HEALTH SYSTEM, INC.; §
TRISTAR SOUTHERN HILLS MEDICAL §
CENTER; TRISTAR STONECREST MEDICAL §
CENTER; TRISTAR SUMMIT MEDICAL §
CENTER; TULANE LAKESIDE HOSPITAL §
FOR WOMEN AND CHILDREN; TULANE §
MEDICAL CENTER; UNIVERSITY §
HEALTHCARE SYSTEM, L.C.; UNIVERSITY §
HOSPITAL, LTD., D/B/A UNIVERSITY §
HOSPITAL & MEDICAL CENTER; WESLEY §
MEDICAL CENTER, LLC; WEST FLORIDA §
PPH, LLC, D/B/A PALMS OF PASADENA §
HOSPITAL; WEST FLORIDA REGIONAL §
MEDICAL CENTER, INC., D/B/A WEST §
FLORIDA HOSPITAL; WEST HOUSTON §
MEDICAL CENTER, §
§

      Defendants.

**RELATOR CLARISSE CHRISTINE TOLEDO'S ORIGINAL COMPLAINT**

## TABLE OF CONTENTS

I.     Introduction to Case .................................................................................................1

II.    Jurisdiction and Venue.............................................................................................3

III.   Government Plaintiff ...............................................................................................4

IV.    Introduction to Relator Clarisse Christine Toledo ..................................................4

       A.     Relator's Background ...................................................................................4

       B.     Original Source .............................................................................................7

V.     Defendants ...............................................................................................................7

       A.     HCA Holdings, Inc. .......................................................................................7

       B.     HCA IRFs ......................................................................................................8

VI.    Respondeat Superior and Vicarious Liability.........................................................28

VII.   Statutory Background .............................................................................................30

       A.     Medicare ......................................................................................................30

       B.     Inpatient Rehabilitation Facilities (IRFs)...................................................31

              1.     Overview of IRFs.............................................................................31

              2.     Patient Evaluation and Claim Submission Process.........................36

       C.     IRF Prospective Payment System (IRF PPS) .............................................37

              1.     Overview ..........................................................................................37

              2.     Compliance with the Sixty Percent Rule ........................................38

              3.     Other Requirements .........................................................................40

              4.     Payment Rates..................................................................................41

       D.     Certifications...............................................................................................42

              1.     Medicare Provider Enrollment Agreement......................................42

|       | 2. | Patient Assessment Instruments | 42 |

|       | 3. | IRF Prospective Payment System Enrollment and Attestation Statements | 43 |

|       | 4. | Form CMS 1450 (UB04) | 44 |

| VIII. | Defendants' Fraud on the Government | | 44 |

|       | A. | Defendants Submitted Claims and Certifications to CMS Based on False and/or Fraudulent Myopathy Diagnoses | 45 |

|       | B. | Defendants Admitted 60% Rule-Compliant Patients on a "Trial Basis" in Order to Boost 60% Rule Compliance Rates | 48 |

|       | C. | Defendants Submitted Claims to CMS for Services Not Provided | 48 |

|       | D. | Defendants Submitted False and/or Fraudulent IRF PAIs to CMS | 50 |

|       | E. | Defendants Submitted Claims to CMS for Care Which Was Not Reasonable or Necessary | 55 |

|       | F. | Defendants Submitted Claims to CMS for Treatment of Patients Without Physician Orders, or With Backdated Physician Orders | 57 |

|       | G. | Defendants Employed Unqualified Directors of Rehabilitation | 58 |

| IX.   | Retaliation Against Relator | | 59 |

| X.    | Actionable Conduct by Defendants | | 70 |

|       | A. | False Claims Act | 70 |

|       |    | 1. Applicable Law | 70 |

|       |    | 2. Defendants' Violations of the False Claims Act | 72 |

|       |    |    | a. Presentation of False Claims: 31 U.S.C. § 3729(a)(1)(A) | 72 |

|       |    |    | b. Making or Using False Records or Statements to Cause Claims to be Paid: 31 U.S.C. § 3729(a)(1)(B) | 73 |

|       |    |    | c. Reverse False Claims (31 U.S.C. § 3729(a)(1)(G)) | 75 |

|       |    |    | d. Retaliation (31 U.S.C. § 3730(h)) | 77 |

XI.     Causes of Action ...................................................................................................78

        A.     Count I – False Claims (31 U.S.C. § 3729(a)(1)(A))...................................78

        B.     Count II – False Records or Statements (31 U.S.C. § 3729(a)(1)(B))..................80

        C.     Count III – Reverse False Claims (31 U.S.C. § 3729(a)(1)(G)) ...........................81

        D.     Count IV – Retaliation (31 U.S.C. § 3730(h))..........................................83

XII.    Demand for Jury Trial..............................................................................................84

XIII.   Documentary Evidence............................................................................................84

1.      Plaintiff/Relator Clarisse Christine Toledo ("Toledo" or "Relator") brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3732, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on her own behalf.   Relator submitted her voluntary Pre-filing Disclosure Statement to the United States, and is submitting an Original Disclosure Statement contemporaneously with the filing of this Complaint.   Relator would respectfully show the following:

## I.      INTRODUCTION TO CASE

2.      Defendant HCA Holdings, Inc. ("HCA") operates Inpatient Rehabilitation Facilities ("IRFs") in eighteen U.S. states.   These IRFs provide intensive rehabilitation services to patients.   HCA IRFs receive Medicare reimbursement through the IRF Prospective Payment System ("IRF PPS"), which pays much higher rates than those paid under the Inpatient Prospective Payment System ("IPPS").

3.      HCA IRFs and HCA (collectively "Defendants") carried out a nationwide fraudulent scheme whereby they could continue to be paid under the more lucrative IRF PPS despite not meeting its requirements, resulting in millions of dollars of Government overpayments.

4.      In order for an IRF to be paid higher rates under the IRF PPS, at least sixty percent of its patients must be "Qualifying Admissions,"[1] meaning that those patients have diagnoses that fall within one of thirteen conditions specified by CMS.   *See* 42 C.F.R. § 412.29(b)(2).   This requirement is known as the "60% Rule."   Myopathy, a disease of the muscle in which the muscle fibers do not function properly, is one of the diagnoses that may make a patient a "Qualifying Admission."

---

[1] *See* 42 C.F.R. § 412.29(b)(2).

5.      Defendants fraudulently used myopathy diagnosis codes to count patients as Qualifying Admissions for purposes of meeting the requirements of the 60% Rule.

6.      Defendants also failed to meet other requirements for payment under the IRF PPS, such as appointing qualified Directors of Rehabilitation, and meeting the "intensive rehabilitation therapy" requirement, also known as the "900 minutes rule."

7.      Defendants made false attestations to CMS in order to continue to qualify for the IRF PPS, and continually submitted false and/or fraudulent IRF Patient Assessment Instruments ("IRF PAIs") in order to maintain payments under the more lucrative IRF PPS, and to ensure that all IRF stays would be reimbursed, even when they were not medically reasonable or necessary, or included services not provided.

8.      Defendants' submission of false and/or fraudulent IRF PAIs not only caused the Government to overpay Defendants, but also falsely indicated patients' degree of dependence and needs for post-IRF care, harming thousands of patients.

9.      Defendants sacrificed patient care in order to rake in payments under the IRF PPS. Therapists left patients unsupervised while doing documentation and in "group therapy" situations, but then recorded this unsupervised time as "therapy" and billed Medicare for it.  Patients in IRFs have particularly severe diagnoses and conditions, making this lack of supervision inexcusable.

10.      HCA's IRFs also maintained woefully insufficient documentation practices. Therapists and staff were either not trained to enter information required for IRF PAIs, or simply did not record the information properly.  In many cases, these practices caused those completing IRF PAIs to simply fabricate IRF PAI information, including information needed for mandatory IRF PAI quality reporting measures.

11.     HCA IRFs frantically proceeded to "make up" for their insufficient documentation systems as the end of each fiscal year approached by fraudulently changing patient diagnoses, IRF PAI information, and admission practices in order to ensure 60% Rule compliance and continued CMS reimbursements.

12.     On one occasion, Relator's direct supervisor even stated that HCA's IRF Bayshore Medical Center should use backdated physician admission orders "to cover [Bayshore], because technically, [Bayshore] shouldn't have been doing any treatment on those patients whatsoever," and because Bayshore had "to do something to cover ourselves." Ex. 12, Excerpts from Transcript of Audio Recording (May 1, 2017), at 3:12–3:22.

13.     HCA and Bayshore Medical Center retaliated against Relator for her reports of fraud to her supervisors and for her efforts to stop fraudulent activity at HCA IRFs by terminating her.

14.     Defendants' nationwide scheme has caused CMS to reimburse Defendants using the more lucrative rates in the IRF PPS, and to pay for medical care which it would not have paid for had it known of Defendants' fraudulent conduct.

15.     Defendants have damaged the United States by causing the Medicare program to pay vastly higher rates than it would have but for Defendants' fraudulent conduct and to pay for unnecessary medical care.

## II.     JURISDICTION AND VENUE

16.     Jurisdiction and venue are proper in the District of Columbia pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729–3732 in the United States by Defendants that damaged the United States government.  CMS, which administers Medicare, maintains an office

in the District of Columbia at 200 Independence Avenue Southwest. Defendants transacted business with CMS by submitting claims to CMS for payment. Defendants are therefore subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1367.

### III.   GOVERNMENT PLAINTIFF

17.   The Government Plaintiff in this lawsuit is the United States of America.

### IV.   INTRODUCTION TO RELATOR CLARISSE CHRISTINE TOLEDO

**A.   Relator's Background**

18.   Relator Clarisse Christine Toledo ("Relator" or "Toledo") is a licensed occupational therapist. She began working for HCA in April of 2014 in the acute care department of Kingwood Medical Center in Kingwood, Texas.

19.   In July of 2014, Relator began working on an "as-needed" basis in the acute care department of Bayshore Medical Center ("Bayshore") in Pasadena, Texas while continuing to work at Kingwood Medical Center.

20.   In April of 2016, Relator transferred to Bayshore and ceased working at Kingwood Medical Center.

21.   In November of 2016, Relator began a new data entry position at Bayshore within the inpatient rehabilitation department, assisting the IRF PAI Coordinator.

22.   In January of 2017, Relator began working as a Prospective Payment System ("PPS") Coordinator in the inpatient rehabilitation department of Bayshore. Relator understood that she had been offered the position as a "backup plan," until a more suitable candidate could be found.

23.     As a PPS Coordinator, Relator was in charge of electronically filling out IRF Patient Assessment Instruments ("PAIs") and submitting them to CMS. Relator also electronically submitted IRF claims to CMS for payment.

24.     In this position, Relator observed and reported many instances of fraud, including fraudulent myopathy diagnoses, submission of claims for medical care that was not reasonable or necessary, submission of PAIs containing false and/or fraudulent representations of minutes of therapy provided to patients, false and/or fraudulent PAI coding, and submission of claims and PAIs with missing or backdated physician admission orders.

25.     Relator also directly spoke with staff, such as therapists and nurses, in order to prevent fraud, as well as to obtain necessary information for PAIs. From these interactions, Relator became aware that, prior to her arrival, fraudulent practices had occurred and that false and/or fraudulent claims had been submitted to Medicare.

26.     Relator not only reported the fraud and other issues she observed to her supervisor and other staff, but often took steps herself to ensure that the fraud would not recur. For example, Relator devised a therapy log sheet for therapists to use when she learned about problems with documentation of therapy minutes. Relator also corrected many false and/or fraudulent IRF PAIs within the permissible correction window, and kept a binder with a log of all corrections that she made.

27.     Nevertheless, Relator's direct supervisor, Kathryn Simmons ("Simmons"), reacted to Relator's reports and efforts to stop fraud with anger or indifference. Simmons told Relator that Simmons was in charge of educating staff, and told Relator, for example, not to speak to Rehabilitation Supervisor Jill Winter about therapy documentation issues. Simmons also became angry when Relator reported fraud to Simmons' direct supervisor, Mark Rozell ("Rozell").

28.     On July 7, 2017, around 1:30 P.M., Simmons asked Relator to change some PAI codes for a patient that had been discharged several months prior.  Relator called Uniform Data Systems ("UDS")—the manufacturer of HCA's CMS IRF PAI software—for guidance on this issue, and she was informed by UDS that this change was impermissible under CMS rules.  Relator immediately relayed this requirement to Simmons.  When Simmons learned that Relator had called UDS, she angrily confronted Relator, telling Relator that she had just spoken to Rozell and would not call him again.

29.     On July 7, 2017, around 3:00 P.M., Clinical Rehabilitation Specialist Kelly Hale asked Relator if she could change patient diagnosis codes on an IRF PAI to a 60%-Rule-compliant diagnosis of "trauma".  The patient's previous diagnosis was not compliant with the 60% Rule. Relator called UDS for guidance, and was informed that this diagnosis could not be changed, per CMS rules.  Relator relayed this requirement to Hale.

30.     Three days later, on July 10, 2017, Relator was terminated from her position at Bayshore as a result of her reports of and efforts to stop fraud.  Relator was brought into a termination meeting with Simmons and Demitra Bevins ("Bevins"), a human resources employee at Bayshore.

31.     Bevins told Relator that she was being terminated because she had "caused financial distress for the hospital."  Bevins did not explain how Relator's actions or performance had done this.  Simmons alleged that Relator had purportedly made errors in entering information.

32.     Relator had, up until that point, never been notified of these purported errors, nor had the alleged errors been discussed or corrected at periodic rehabilitation team meetings. Relator neither received notice before that time of any poor job performance, nor did she receive any verbal warnings.

33.     Relator asked for the names of the specific patients whose files contained her alleged errors, but neither person present at her termination—including Simmons, who was in charge of all rehabilitation admissions—could give her that information.

**B.      Original Source**

34.     There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of the information on which she bases her allegations. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has independent knowledge that materially adds to any publicly disclosed allegations or transactions and provided this information to the United States prior to filing this Complaint by serving a voluntary Pre-filing Disclosure Statement.

35.     Relator is also submitting an Original Disclosure Statement contemporaneously with the filing of this Complaint, disclosing to the United States substantially all material evidence and information related to this Complaint.

## V.   DEFENDANTS

**A.      HCA Holdings, Inc.**

36.     HCA Holdings, Inc. ("HCA") is a Delaware corporation and certified Medicare and Medicaid provider which owns, manages, or operates IRFs in eighteen U.S. states.  The principal executive office is located at One Park Plaza, Nashville, Tennessee, 37203.  The registered agent for HCA is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

37.     HCA is publicly traded on the New York Stock Exchange under the ticker symbol "HCA."

38.     HCA utilizes twelve regional divisions to oversee the healthcare facilities located within each region.  Each division has its own President and regional officers.

**B.     HCA IRFs**

**1.  Bay Hospital, Inc., d/b/a Gulf Coast Regional Medical Center**

39.     Bay Hospital, Inc. is a Florida corporation doing business in Florida as Gulf Coast Regional Medical Center.   Gulf Coast Regional Medical Center owns and operates The Rehabilitation Center of Gulf Coast Regional Medical Center, a Medicare and Medicaid IRF located at 2024 State Avenue, Panama City, Florida 32405.  The registered agent for Bay Hospital, Inc. is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**2.  Bayshore Medical Center, Inc.**

40.     Bayshore Medical Center, Inc. ("Bayshore") is a Texas corporation and a certified Medicare and Medicaid IRF provider.  The facility is located at 4000 Spencer Highway, Pasadena, Texas, 77504.  The registered agent for Bayshore Medical Center, Inc. is Richard F. Sewell, 9030 North Freeway, Suite 206, Houston, Texas 77037.

41.     Approximately 65 to 70% of Bayshore's patients are insured by Medicare only. About 20% are insured by a combination of Medicare and Texas Medicaid.

**3.  Central Florida Regional Hospital, Inc.**

42.     Central Florida Regional Hospital, Inc. is a Florida corporation and a certified Medicare and Medicaid IRF provider.  The facility is located at 1401 West Seminole Boulevard, Sanford, Florida 32771.  The registered agent for Central Florida Regional Hospital, Inc. is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 4. Central Tennessee Hospital Corporation, d/b/a TriStar Horizon Medical Center

43.     Central Tennessee Hospital Corporation is a Tennessee corporation doing business in Tennessee as TriStar Horizon Medical Center.  TriStar Horizon Medical Center is a certified Medicare and Medicaid IRF provider located at 111 Highway 70 East, Dickson, Tennessee 37055. The registered agent for Central Tennessee Hospital Corporation is CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929.

### 5. Chippenham & Johnston-Willis Hospitals, Inc., d/b/a Johnston-Willis Hospital

44.     Chippenham & Johnston-Willis Hospitals, Inc. is a Virginia corporation doing business in Virginia as Johnston-Willis Hospital.  Johnston-Willis Hospital, located at 1401 Johnston-Willis Drive, Richmond, Virginia 23235, is a certified Medicare and Medicaid IRF provider.  The registered agent for Chippenham & Johnston-Willis Hospitals, Inc. is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

### 6. Clear Lake Regional Medical Center, Inc.

45.     Clear Lake Regional Medical Center, Inc. is a Texas corporation and a Medicare and Medicaid certified IRF provider.  The facility is located at 400 Medical Center Boulevard, Webster, Texas 77598.  The registered agent for Clear Lake Regional Medical Center, Inc. is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### 7. Coliseum Health Group, Inc.

46.     Coliseum Health Group, Inc. is a Georgia corporation.  Its registered agent is CT Corporation System, 289 South Culver Street, Lawrenceville, Georgia 30046.  Coliseum Health Group, Inc. owns the following certified Medicare and Medicaid IRF providers:

- Coliseum Northside Hospital, located at 400 Charter Boulevard, Macon, Georgia 31210

- Coliseum Rehabilitation Center, located at 350 Hospital Drive, Macon, Georgia 31217.

### 8. Colleton Medical Arts, LLC, d/b/a Colleton Medical Center

47.     Colleton Medical Arts, LLC is a Delaware limited liability company doing business in South Carolina as Colleton Medical Center. Colleton Medical Center is a certified Medicare and Medicaid IRF provider located at 501 Robertson Boulevard, Walterboro, South Carolina 29488. Colleton Medical Arts, LLC's registered agent is CT Corporation System, 2 Office Park Court, Suite 103, Columbia, South Carolina 29223.

### 9. Columbia/Alleghany Regional Hospital, Inc., d/b/a LewisGale Hospital Alleghany

48.     Columbia/Alleghany Regional Hospital, Inc. is a Virginia corporation doing business in Virginia as LewisGale Hospital Alleghany. LewisGale Hospital Alleghany is a Medicare and Medicaid IRF provider located at 1 ARH Lane, Low Moor, Virginia 24457. Columbia/Alleghany Regional Hospital, Inc.'s registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

### 10. Columbia Good Samaritan Health System L.P., d/b/a Good Samaritan Hospital

49.     Columbia Good Samaritan Health System L.P. is a Delaware limited partnership doing business in California as Good Samaritan Hospital. Good Samaritan Hospital is a certified Medicare and Medicaid IRF provider located at 15891 Los Gatos Almaden Road, San Jose, California 95032. Columbia Good Samaritan Health System L.P.'s registered agent is The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

### 11. Columbia/HCA John Randolph, Inc., d/b/a John Randolph Medical Center

50.     Columbia/HCA John Randolph, Inc. is a Virginia corporation doing business in Virginia as John Randolph Medical Center. John Randolph Medical Center is a Medicare and

Medicaid IRF located at 411 West Randolph Road, Hopewell, Virginia 23860. Columbia/HCA John Randolph, Inc.'s registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

### 12. Conroe Medical Center, LLC, d/b/a Conroe Regional Medical Center

51. Conroe Medical Center, LLC is a Texas limited liability company doing business in Texas as Conroe Regional Medical Center. Conroe Regional Medical Center is a certified Medicare and Medicaid IRF provider located at 504 Medical Center Boulevard, Conroe, Texas 77304. The registered agent for Conroe Medical Center, LLC is Timothy Mueller, 2941 South Lake Vista Drive, Lewisville, Texas 75067.

### 13. Doctors Hospital of Augusta, LLC

52. Doctors Hospital of Augusta, LLC is a Delaware limited liability company doing business in Georgia. Doctors Hospital of Augusta is a certified Medicare and Medicaid IRF located at 3651 Wheeler Road, Augusta, Georgia 30909. Doctors Hospital of Augusta, LLC's registered agent is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

### 14. Eastern Idaho Health Services, Inc., d/b/a Eastern Idaho Regional Medical Center

53. Eastern Idaho Health Services, Inc. is an Idaho corporation doing business in Idaho as Eastern Idaho Regional Medical Center. Eastern Idaho Regional Medical Center is a certified Medicare and Medicaid IRF located at 3100 Channing Way, Idaho Falls, Idaho 83404. Eastern Idaho Health Services, Inc.'s registered agent is CT Corporation System, 921 South Orchard Street, Suite G, Boise, Idaho 83705.

### 15. East Jefferson General Hospital

54.     East Jefferson General Hospital is a Medicare and Medicaid certified IRF provider located at 4200 Houma Boulevard, Metairie, Louisiana 70006. East Jefferson General Hospital is in the process of being acquired by HCA and University Healthcare System, L.C., a Louisiana limited liability company.   University Healthcare System, L.C.'s registered agent is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

### 16. Eastside Medical Center, LLC

55.     Eastside Medical Center, LLC is a Georgia limited liability company doing business in Georgia. Eastside Medical Center is a certified Medicare and Medicaid IRF located at 2160 Fountain Drive, Snellville, Georgia 30078. Eastside Medical Center, LLC's registered agent is CT Corporation System, 289 South Culver Street, Lawrenceville, Georgia 30046.

### 17. El Paso Healthcare System, Ltd., d/b/a Las Palmas Rehabilitation Hospital

56.     El Paso Healthcare System, Ltd. is a Texas limited company doing business in Texas as Las Palmas Rehabilitation Hospital. Las Palmas Rehabilitation Hospital is a certified Medicare and Medicaid IRF located at 300 Waymore Drive, El Paso, Texas 79902. El Paso Healthcare System, Ltd.'s registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### 18. Fawcett Memorial Hospital, Inc.

57.     Fawcett Memorial Hospital, Inc. is a Florida corporation and a certified Medicare and Medicaid IRF provider. The facility is located at 21298 Olean Boulevard, Port Charlotte, Florida 33949. The registered agent for Fawcett Memorial Hospital, Inc. is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**19. Fort Walton Beach Medical Center, Inc.**

58.     Fort Walton Beach Medical Center, Inc. is a Florida corporation and a certified Medicare and Medicaid IRF provider.  The facility is located at 1000 Mar Walt Drive, Fort Walton Beach, Florida 32547.  The registered agent for Fort Walton Beach Medical Center, Inc. is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**20. Galen Hospital Alaska, Inc., d/b/a Alaska Regional Hospital**

59.     Galen Hospital Alaska, Inc. is a Delaware corporation doing business in Alaska as Alaska Regional Hospital.  Alaska Regional Hospital is a certified Medicare and Medicaid IRF provider located at 2801 DeBarr Road, Anchorage, Alaska 99508.  The registered agent for Galen Hospital Alaska, Inc. is CT Corporation System, 9360 Glacier Highway, Suite 202, Juneau, Alaska 99801.

**21. Grand Strand Regional Medical Center, LLC**

60.     Grand Strand Regional Medical Center, LLC is a Delaware limited liability company which does business in South Carolina.  Grand Strand Regional Medical Center is a Medicare and Medicaid IRF located at 809 82nd Parkway, Myrtle Beach, South Carolina 29572.  Grand Strand Regional Medical Center, LLC's agent for service is CT Corporation System, 2 Office Park Court, Suite 103, Columbia, South Carolina 29223.

**22. Gulf Coast Division, Inc.**

61.     Gulf Coast Division, Inc. is a Texas corporation.  Its registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  Gulf Coast Division, Inc. owns and operates the following certified Medicare and Medicaid IRFs:

- Corpus Christi Medical Center – Doctors Regional, located at 3315 South Alameda Street, Corpus Christi, Texas 78411

- Tomball Regional Medical Center, located at 605 Holderrieth Boulevard, Tomball, Texas 77375

- West Houston Medical Center, located at 12141 Richmond Avenue, Houston, Texas 77082.

## 23. HCA-HealthONE, LLC

62.     HCA-HealthONE, LLC is a Colorado limited liability company.   Its registered agent is The Corporation Company, 7700 East Arapahoe Road, Suite 220, Centennial, Colorado 80112.  HCA-HealthONE, LLC owns and operates the following:

- Presbyterian/St. Luke's Medical Center, a Medicare and Medicaid certified IRF located at 1719 East 19th Avenue, Denver, Colorado 80218

- Spalding Rehabilitation Hospital, a certified Medicare and Medicaid IRF located at 900 Potomac Street, Aurora, Colorado 80011

- Swedish Medical Center, a certified Medicare and Medicaid IRF located at 501 East Hampden Avenue, Englewood, Colorado 80113.

## 24. HCA Health Services of Florida, Inc., d/b/a Blake Medical Center

63.     HCA Health Services of Florida, Inc. is a Florida corporation doing business in Florida as Blake Medical Center.  Blake Medical Center is a certified Medicare and Medicaid IRF provider located at 2020 59th Street West, Bradenton, Florida 34209.  HCA Health Services of Florida, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

## 25. HCA Health Services of New Hampshire, Inc., d/b/a Parkland Medical Center

64.     HCA Health Services of New Hampshire, Inc. is a New Hampshire corporation doing business in New Hampshire as Parkland Medical Center.  Parkland Medical Center is a Medicare and Medicaid IRF provider located at 1 Parkland Drive, Derry, New Hampshire 03038. HCA Health Services of New Hampshire, Inc.'s registered agent is CT Corporation System, 9 Capitol Street, Concord, New Hampshire 03301.

14

### 26. HCA Health Services of Oklahoma, Inc.

65.    HCA Health Services of Oklahoma, Inc. is an Oklahoma corporation. Its registered agent is The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma 73128. HCA Health Services of Oklahoma, Inc. owns and operates the following Medicare and Medicaid IRF providers:

- OU Medical Center, located at 700 Northeast 13th Street, Oklahoma City, Oklahoma 73104
- OU Medical Center Edmond, located at 1 South Bryant, Edmond, Oklahoma 73034.

### 27. HCA Health Services of Virginia, Inc., d/b/a Parham Doctors' Hospital

66.    HCA Health Services of Virginia, Inc. is a Virginia corporation doing business in Virginia as Parham Doctors' Hospital. Parham Doctors' Hospital is a certified Medicare and Medicaid IRF provider located at 7700 East Parham Road, Richmond, Virginia 23294. HCA Health Services of Virginia, Inc.'s registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia, 23060.

### 28. Hendersonville Hospital Corporation, d/b/a TriStar Hendersonville Medical Center

67.    Hendersonville Hospital Corporation is a Tennessee corporation doing business in Tennessee as TriStar Hendersonville Medical Center. TriStar Hendersonville Medical Center is a Medicare and Medicaid IRF provider located at 355 New Shackle Island Road, Hendersonville, Tennessee 37075. Hendersonville Hospital Corporation's registered agent is CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929.

### 29. Houston Northwest Medical Center, Inc.

68.    Houston Northwest Medical Center, Inc. is a Texas corporation and a Medicare and Medicaid IRF provider. The facility is located at 710 Cypress Creek Parkway, Houston, Texas

77090.  Houston Northwest Medical Center, Inc.'s registered agent is Susan Muller, 710 FM 1960 West, Houston, Texas 77090.

### 30. HTI Memorial Hospital Corporation, d/b/a TriStar Skyline Medical Center

69.     HTI Memorial Hospital Corporation is a Tennessee corporation doing business in Tennessee as TriStar Skyline Medical Center.  TriStar Skyline Medical Center is a certified Medicare and Medicaid IRF provider located at 3441 Dickerson Pike, Nashville, Tennessee 37207. HTI Memorial Hospital Corporation's registered agent is CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929.

### 31. Kendall Healthcare Group, Ltd., d/b/a Kendall Regional Medical Center

70.     Kendall Healthcare Group, Ltd. is a Florida limited partnership doing business in Florida as Kendall Regional Medical Center.  Kendall Regional Medical Center is a certified Medicare and Medicaid IRF provider at 11750 Southwest 40th Street, Miami, Florida 33175. Kendall Healthcare Group, Ltd.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 32. Kingwood Medical Center, LLC

71.     Kingwood Medical Center, LLC is a Texas limited liability company and a certified Medicare and Medicaid IRF provider.  The facility is located at 22999 U.S. Highway 59 North, Kingwood, Texas 77339.  Kingwood Medical Center, LLC's registered agent is Timothy M. Mueller, 2941 South Lake Vista Drive, Lewisville, Texas 75067.

### 33. Largo Medical Center, Inc.

72.     Largo Medical Center, Inc. is a Florida corporation doing business in Florida. Largo Medical Center, Inc. is a certified Medicare and Medicaid IRF provider located at 2025

Indian Rocks Road, Largo, Florida 33774. Largo Medical Center, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 34. Lawnwood Medical Center, Inc., d/b/a Lawnwood Physical Rehabilitation Center

73.　　Lawnwood Medical Center, Inc. is a Florida corporation doing business in Florida as Lawnwood Physical Rehabilitation Center. Lawnwood Physical Rehabilitation Center is a certified Medicare and Medicaid IRF provider located at 1860 North Lawnwood Circle, Fort Pierce, Florida 34950. Lawnwood Medical Center, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 35. LewisGale Medical Center, LLC

74.　　LewisGale Medical Center, LLC is a Delaware limited liability company doing business in Virginia. LewisGale Medical Center, LLC is a certified Medicare and Medicaid IRF provider located at 1900 Electric Road, Salem, Virginia 24153. LewisGale Medical Center, LLC's registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

### 36. Los Robles Regional Medical Center MOB, LLC, d/b/a Los Robles Hospital & Medical Center

75.　　Los Robles Regional Medical Center MOB, LLC is a California limited liability corporation doing business in California as Los Robles Hospital & Regional Medical Center. Los Robles Hospital & Regional Medical Center is a certified Medicare and Medicaid IRF provider at 215 West Janss Road, Thousand Oaks, California 91360. Los Robles Regional Medical Center MOB, LLC's registered agent is CT Corporation System, 818 West 7th Street, Suite 930, Los Angeles, California 90017.

**37. Mainland Medical Center, Inc.**

76.     Mainland Medical Center, Inc. is a Texas corporation and a Medicare and Medicaid IRF provider.  The facility is located at 6801 Emmett F. Lowry Expressway, Texas City, Texas 77591.  Mainland Medical Center, Inc.'s registered agent is Carmen Shinn, 6801 Emmett F. Lowry Expressway, Texas City, Texas 77591.

**38. Marion Community Hospital, Inc., d/b/a Ocala Regional Medical Center**

77.     Marion Community Hospital, Inc. is a Florida corporation doing business in Florida as Ocala Regional Medical Center.  Ocala Regional Medical Center is a certified Medicare and Medicaid IRF provider at 1431 Southwest 1st Avenue, Ocala, Florida 34471.  Marion Community Hospital, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**39. Medical City Dallas Hospital, Inc., d/b/a Medical City Hospital**

78.     Medical City Dallas Hospital, Inc. is a Texas corporation doing business in Texas as Medical City Hospital.  Medical City Hospital is a certified Medicare and Medicaid IRF provider located at 7777 Forest Lane, Dallas, Texas 75230.  Medical City Dallas Hospital, Inc.'s registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

**40. Methodist Healthcare System of San Antonio, LLP**

79.     Methodist Healthcare System of San Antonio, LLP is a Texas limited liability partnership.  Its registered agent is Capitol Corporate Services, Inc., 206 East 9th Street, Suite 1300, Austin, Texas 78701. Methodist Healthcare System of San Antonio, LLP owns and operates the following:

- Methodist Hospital, a Medicare and Medicaid IRF located at 7700 Floyd Curl Drive, San Antonio, Texas 78229.

18

- Metropolitan Methodist Hospital, a certified Medicare and Medicaid IRF located at 1310 McCullough Avenue, San Antonio, Texas 78212.

### 41. MidAmerica Division, Inc.,  d/b/a Women's & Children's Hospital

80.     MidAmerica Division, Inc. is a Louisiana corporation doing business in Louisiana as Women's & Children's Hospital.  Women's & Children's Hospital is a Medicare and Medicaid IRF provider located at 4600 Ambassador Caffrey Parkway, Lafayette, Louisiana 70508. MidAmerica Division, Inc.'s registered agent is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816.

### 42. Midwest Division – MMC, LLC, d/b/a Menorah Medical Center

81.     Midwest Division – MMC, LLC is a Delaware limited liability company doing business in Kansas as Menorah Medical Center.  Menorah Medical Center is a certified Medicare and Medicaid IRF provider located at 5721 West 119th Street, Overland Park, Kansas 66209. Midwest Division – MMC, LLC's registered agent is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

### 43. Midwest Division – RMC, LLC, d/b/a Research Medical Center

82.     Midwest Division – RMC, LLC is a Delaware limited liability company doing business in Missouri as Research Medical Center.  Research Medical Center is a certified Medicare and Medicaid IRF provider located at 2316 East Meyer Road, Kansas City, Missouri 64132. Midwest Division – RMC, LLC's registered agent is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

### 44. Montgomery Regional Hospital, Inc., d/b/a LewisGale Hospital Montgomery

83.     Montgomery Regional Hospital, Inc. is a Virginia corporation doing business in Virginia as LewisGale Hospital Montgomery.  LewisGale Hospital Montgomery is a Medicare and Medicaid IRF provider located at 3700 South Main Street, Blacksburg, Virginia 24060.

Montgomery Regional Hospital, Inc.'s registered agent is CT Corporation System, 4701 Cox Road, Suite 285, Glen Allen, Virginia 23060.

### 45. Mountainstar Medical Group – Cache Valley, LLC, d/b/a Cache Valley Hospital

84.     Mountainstar Medical Group – Cache Valley, LLC is a Utah limited liability company doing business in Utah as Cache Valley Hospital.  Cache Valley Hospital is a Medicare and Medicaid IRF provider located at 2380 North 400 East, Logan, Utah 84341.  Mountainstar Medical Group – Cache Valley, LLC's registered agent is CT Corporation System, 1108 East South Union Avenue, Midvale, Utah 84047.

### 46. Mountainstar Medical Group – Ogden Regional Medical Center, LLC

85.     Mountainstar Medical Group – Ogden Regional Medical Center, LLC is a Utah limited liability company and a certified Medicare and Medicaid IRF provider.  The facility is located at 5475 South 500 East, Ogden, Utah 84405.  Mountainstar Medical Group – Ogden Regional Medical Center, LLC's registered agent is CT Corporation System, 1108 East South Union Avenue, Midvale, Utah 84047.

### 47. Mountainstar Medical Group – St. Mark's Hospital, LLC

86.     Mountainstar Medical Group – St. Mark's Hospital, LLC is a Utah limited liability company and a certified Medicare and Medicaid IRF provider.  The facility is located at 1200 East 3900 South, Salt Lake City, Utah 84124.  Mountainstar Medical Group – St. Mark's Hospital, LLC's registered agent is CT Corporation System, 1108 East South Union Avenue, Midvale, Utah 84047.

### 48. Mountain View Hospital, Inc., d/b/a Mountain View Hospital – Payson

87.     Mountain View Hospital, Inc. is a Utah corporation doing business in Utah as Mountain View Hospital – Payson.  Mountain View Hospital – Payson is a Medicare and Medicaid

IRF provider located at 1000 East 100 North, Payson, Utah 84651.  Mountain View Hospital, Inc.'s registered agent is CT Corporation System, 1108 East South Union Avenue, Midvale, Utah 84047.

### 49. New Port Richey Hospital, Inc., d/b/a Medical Center of Trinity

88.    New Port Richey Hospital, Inc. is a Florida corporation doing business in Florida as Medical Center of Trinity.  Medical Center of Trinity is a Medicare and Medicaid IRF provider located at 9330 State Road 54, Trinity, Florida 34655.  New Port Richey Hospital, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 50. North Florida Regional Medical Center, Inc.

89.    North Florida Regional Medical Center, Inc. is a Florida corporation and a Medicare and Medicaid IRF provider.  The facility is located at 6500 West Newberry Road, Gainesville, Florida 32605.  North Florida Regional Medical Center, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 51. North Texas Division, Inc., d/b/a Medical City Healthcare

90.    North Texas Division, Inc. is a Texas corporation doing business in Texas as Medical City Healthcare.  Its registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.  North Texas Division, Inc. owns and operates the following:

- Medical City Arlington, a Medicare and Medicaid IRF provider located at 3301 Matlock Road, Arlington, Texas 76015

- Medical City Fort Worth, a certified Medicare and Medicaid IRF provider located at 900 8th Avenue, Fort Worth, Texas 76104

- Medical City Lewisville, a certified Medicare and Medicaid IRF provider located at 500 West Main Street, Lewisville, Texas 75057.

**52. Notami Hospitals of Florida, Inc., d/b/a Lake City Medical Center**

91.     Notami Hospitals of Florida, Inc. is a Florida corporation doing business in Florida as Lake City Medical Center.  Lake City Medical Center is a Medicare and Medicaid IRF provider located at 340 Northwest Commerce Drive, Lake City, Florida 32055.  Notami Hospitals of Florida, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**53. Okeechobee Hospital, Inc., d/b/a Raulerson Hospital**

92.     Okeechobee Hospital, Inc. is a Florida corporation doing business in Florida as Raulerson Hospital.  Raulerson Hospital is a Medicare and Medicaid IRF provider located at 1796 Highway 441 North, Okeechobee, Florida 34972.  Okeechobee Hospital, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**54. Orange Park Medical Center, Inc.**

93.     Orange Park Medical Center, Inc. is a Florida corporation and a certified Medicare and Medicaid IRF provider.  The facility is located at 1883 Kingsley Avenue, Orange Park, Florida 32073.  Orange Park Medical Center's registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**55. Parkridge Medical Center, Inc.**

94.     Parkridge Medical Center, Inc. is a Tennessee corporation and a certified Medicare and Medicaid IRF provider.  The facility is located at 2333 McCallie Avenue, Chattanooga, Tennessee 37404.  Parkridge Medical Center's registered agent is CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929.

**56. Plantation General Hospital L.P.**

95.     Plantation General Hospital L.P. is a Florida limited partnership.  Its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324. Plantation General Hospital L.P. owns and operates the following IRF providers:

- Bay View Rehabilitation at Mercy Hospital, a Medicare and Medicaid IRF provider located at 3663 South Miami Avenue, Miami, Florida 33133

- Plantation General Hospital, a certified Medicare and Medicaid IRF provider located at 401 Northwest 42nd Avenue, Plantation, Florida 33317.

**57. Putnam Community Medical Center of North Florida, LLC**

96.     Putnam Community Medical Center of North Florida, LLC is a Florida limited liability company and Medicare and Medicaid IRF provider.  The facility is located at 611 Zeagler Drive, Palatka, Florida 32177.  Putnam Community Medical Center of North Florida, LLC's registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**58. Redmond Park Hospital, LLC, d/b/a Redmond Regional Medical Center**

97.     Redmond Park Hospital, LLC is a Georgia limited liability company doing business in Georgia as Redmond Regional Medical Center.  Redmond Regional Medical Center is a certified Medicare and Medicaid IRF provider located at 501 Redmond Road, Rome, Georgia 30165.  Redmond Park Hospital, LLC's registered agent is The Corporation Company, 112 North Main Street, Cumming, Georgia 30040.

**59. Rio Grande Regional Hospital, Inc.**

98.     Rio Grande Regional Hospital, Inc. is a Texas corporation and a Medicare and Medicaid IRF provider.  The facility is located at 101 East Ridge Road, McAllen, Texas 78503.

Rio Grande Regional Hospital, Inc.'s registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

### 60. San Jose Medical Center, LLC, d/b/a Regional Medical Center of San Jose

99.    San Jose Medical Center, LLC is a Delaware limited liability company doing business in California as Regional Medical Center of San Jose.  Regional Medical Center of San Jose is a Medicare and Medicaid IRF provider located at 225 North Jackson Avenue, San Jose, California 95116.  San Jose Medical Center, LLC's registered agent is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

### 61. Sarasota Doctors Hospital, Inc., d/b/a Doctors Hospital of Sarasota

100.    Sarasota Doctors Hospital, Inc. is a Florida corporation doing business in Florida as Doctors Hospital of Sarasota.  Doctors Hospital of Sarasota is a Medicare and Medicaid IRF provider located at 5731 Bee Ridge Road, Sarasota, Florida 34233.  Sarasota Doctors Hospital, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

### 62. South Atlantic Division, Inc., d/b/a Fairview Park Hospital

101.    South Atlantic Division, Inc. is a South Carolina corporation doing business in Georgia as Fairview Park Hospital.  Fairview Park Hospital is a certified Medicare and Medicaid IRF located at 200 Industrial Boulevard, Dublin, Georgia 30140.  South Atlantic Division, Inc.'s registered agent is CT Corporation System, 2 Office Park Court, Suite 103, Columbia, South Carolina 29223.

### 63. St. David's Healthcare Partnership, LLP

102.    St. David's Healthcare Partnership, LLP is a Texas limited liability partnership.  Its

registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

St. David's Healthcare Partnership, LLP owns and operates the following:

- St. David's Georgetown Hospital, a Medicare and Medicaid IRF provider located at 2000 Scenic Drive, Georgetown, Texas 78626.

- St. David's North Austin Medical Center, a certified Medicare and Medicaid IRF located at 12221 North Mopac Expressway, Austin, Texas 78704

- St. David's Rehabilitation Hospital, a certified Medicare and Medicaid IRF located at 1005 East 32nd Street, Austin, Texas 78705

- St. David's Round Rock Medical Center, a certified Medicare and Medicaid IRF located at 2400 Round Rock Avenue, Round Rock, Texas 78681.

### 64. Sunrise Hospital & Medical Center, LLC

103.    Sunrise Hospital & Medical Center, LLC is a Delaware limited liability company

doing business in Nevada.  Sunrise Hospital & Medical Center, LLC is a certified Medicare and

Medicaid IRF provider located at 3186 South Maryland Parkway, Las Vegas, Nevada 89109.

Sunrise Hospital & Medical Center, LLC's registered agent is The Corporation Trust Company,

1209 Orange Street, Wilmington, Delaware 19801.

### 65. Sunrise Mountainview Hospital, Inc., d/b/a MountainView Hospital

104.    Sunrise Mountainview Hospital, Inc. is a Nevada corporation doing business in

Nevada as MountainView Hospital.  MountainView Hospital is a certified Medicare and Medicaid

IRF provider located at 3100 North Tenaya Way, Las Vegas, Nevada 89128.    Sunrise

Mountainview Hospital, Inc.'s registered agent is The Corporation Trust Company of Nevada, 701

South Carson Street, Suite 200, Carson City, Nevada 89701.

**66. Terre Haute Regional Hospital, L.P.**

105.    Terre Haute Regional Hospital, L.P. is a Delaware limited partnership doing business in Indiana and a certified Medicare and Medicaid IRF provider. The facility is located at 3901 South 7th Street, Terre Haute, Indiana, 47802. Terre Haute Regional Hospital, L.P.'s registered agent is CT Corporation System, 150 West Market Street, Suite 800, Indianapolis, Indiana, 46204.

**67. TriStar Health System, Inc.**

106.    TriStar Health System, Inc. is a Tennessee corporation. Its registered agent is CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929. TriStar Health System, Inc. owns and operates the following:

- TriStar Ashland City Medical Center, a Medicare and Medicaid IRF provider located at 313 North Main Street, Ashland City, Tennessee 37015.

- TriStar Centennial Medical Center, a Medicare and Medicaid IRF provider located at 2300 Patterson Street, Nashville, Tennessee 37203

- TriStar Southern Hills Medical Center, a certified Medicare and Medicaid IRF provider located at 391 Wallace Road, Nashville, Tennessee 37211

- TriStar StoneCrest Medical Center, a Medicare and Medicaid IRF provider located at 200 StoneCrest Boulevard, Smyrna, Tennessee 37167

- TriStar Summit Medical Center, a certified Medicare and Medicaid IRF provider located at 5655 Frist Boulevard, Hermitage, Tennessee 37076.

**68. University Healthcare System, L.C.**

107.    University Healthcare System, L.C. is a Louisiana limited liability company. Its registered agent is CT Corporation System, 3867 Plaza Tower Drive, Baton Rouge, Louisiana 70816. University Healthcare System, L.C. owns and operates the following:

- Tulane Lakeside Hospital for Women and Children, a Medicare and Medicaid IRF located at 4700 South I-10 Service Road West, Metairie, Louisiana 70001

- Tulane Medical Center, a certified Medicare and Medicaid IRF located at 1415 Tulane Avenue, New Orleans, Louisiana 70112.

**69. University Hospital, Ltd., d/b/a University Hospital & Medical Center**

108.    University Hospital, Ltd. is a Florida limited company doing business in Florida as University Hospital & Medical Center.  University Hospital & Medical Center is a Medicare and Medicaid IRF provider at 7201 North University Drive, Tamarac, Florida 33321.  University Hospital, Ltd.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**70. Wesley Medical Center, LLC**

109.    Wesley Medical Center, LLC is a Kansas corporation and a Medicare and Medicaid IRF provider.  The facility is located at 550 North Hillside, Wichita, Kansas 67214.  Wesley Medical Center, LLC's registered agent is STK Registered Agent, Inc., 6201 College Boulevard, Suite 500, Overland Park, Kansas 66211.

**71. West Florida – PPH, LLC, d/b/a Palms of Pasadena Hospital**

110.    West Florida – PPH, LLC is a Florida limited liability company doing business in Florida as Palms of Pasadena Hospital.  Palms of Pasadena Hospital is a certified Medicare and Medicaid IRF provider located at 1501 Pasadena Avenue, St. Petersburg, Florida 33707.  West Florida – PPH, LLC's registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

**72. West Florida Regional Medical Center, Inc., d/b/a West Florida Hospital**

111.    West Florida Regional Medical Center, Inc. is a Florida corporation doing business in Florida as West Florida Hospital.  West Florida Hospital is a certified Medicare and Medicaid IRF provider located at 8383 North Davis Highway, Pensacola, Florida 32514.  West Florida

Regional Medical Center, Inc.'s registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

## VI.   RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

112.   Any and all acts alleged herein to have been committed by the Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

113.   Defendants HCA and HCA IRFs are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under legal theories of respondeat superior.   HCA utilizes regional divisions and regional officers to oversee the IRFs located within each region.   HCA's regional divisions are as follows:

| Division | Division's Legal Name(s) | Areas Within Division | Current Regional President |
|---|---|---|---|
| Capital Division | Capital Division, Inc. | Northern Kentucky, Virginia, New Hampshire, Indiana | Tim McManus[2] |
| Central & West Texas Division | St. David's Healthcare Partnership, LLP; El Paso Healthcare System, Ltd. | Central Texas (Austin, TX area), Western Texas | C. David Huffstutler |
| Continental Division | Continental Division, Inc. | Colorado, Central Kansas | Sylvia Young[3] |
| East Florida Division | East Florida Division, Inc. | Southeastern Florida | Michael G. Joseph |
| Far West Division | Far West Division, Inc. | California, Nevada | Bryan R. Rogers |

[2] Tim McManus became President of the Capital Division on August 1, 2016.  His predecessor was Rob Carrel.

[3] Sylvia Young replaced Jeff Dorsey as President of the Continental Division on June 1, 2012.

| Gulf Coast Division | Gulf Coast Division, Inc. | Southern Texas, Eastern Texas | Troy A. Villarreal[4] |
| Mid America Division | MidAmerica Division, Inc. | Eastern Kansas, Missouri, Louisiana | Maurice L. Lagarde III |
| Mountain Division | Mountain Division, Inc. | Alaska, Utah, Idaho | Gregory Angle[5] |
| North Florida Division | North Florida Division I, Inc. | Northern Florida (excluding Jacksonville, FL) | Michael P. Joyce |
| North Texas Division | North Texas Division, Inc. | Northern Texas, Oklahoma | Erol R. Akdamar[6] |
| San Antonio Division | San Antonio Division, Inc. | Central Texas (San Antonio, TX area) | Jaime Wesolowski |
| South Atlantic Division | South Atlantic Division, Inc. | South Carolina, Northeastern Georgia, Central Georgia, Southern Georgia, Northern Florida (Jacksonville, FL area) | Hugh Tappan[7] |
| TriStar Division | TriStar Health System, Inc. | Tennessee, Southern Kentucky, Northern Georgia | Heather Rohan[8] |
| West Florida Division | West Florida Division, Inc. | Western Central Florida | Peter Marmerstein |

114.   Furthermore, HCA utilizes a central electronic clinical information system and software in all of its IRFs. HCA IRFs utilize a medical record software called Meditech, prepare

---

[4] Troy A. Villarreal's predecessor was Maura Walsh, who served as President of the Gulf Coast Division until June 20, 2016.

[5] Gregory Angle's predecessor was John Hanshaw, who served as President of the Mountain Division from 2005 to January 1, 2014.

[6] Erol R. Akdamar's predecessor was James C. Scoggin, Jr., who retired on October 1, 2013.

[7] Hugh Tappan replaced Jamie Thomas as President of the South Atlantic Division on January 1, 2015.

[8] Heather Rohan replaced Steve Corbeil, who was President of the TriStar Division from September 23, 2011 to December 1, 2016.

IRF PAIs and claims for submission to CMS utilizing Uniform Data System ("UDS") software,[9] and submit those IRF PAIs and claims to CMS through a vendor called QIES.  Some Meditech data autopopulates into IRF PAI fields.

115.    HCA's corporate head office has access to all HCA IRFs' UDS software data.  HCA corporate monitors and utilizes this data for rankings and reports, for example.  Of particular importance, HCA corporate also tracks high utilization of certain diagnoses by its IRFs.

116.    HCA IRFs are also linked to each other on a regional level, so that PPS coordinators at one facility can access UDS records from other facilities.

117.    In addition, HCA aggregates all revenues from its IRFs and incorporates that information into one consolidated financial statement.  *See* Ex. 9, HCA's Form 10-K for Fiscal Year 2016.

118.    The past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity. The HCA IRFs are mere instrumentalities and/or agents of HCA.

## VII.    STATUTORY BACKGROUND

### A.    Medicare

119.    Medicare is a federally-funded health insurance program that provides medical coverage for individuals who are over sixty-five years of age and younger individuals with certain disabilities, end-stage renal disease, and amyotrophic lateral sclerosis. 42 U.S.C. § 1395 *et seq.*  It is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the

---

[9] UDS is a nonprofit organization affiliated with the State University of New York at Buffalo.  It provides rehabilitation data to the medical industry, drafted the Functional Independence Measure ("FIM") (utilized in CMS' IRF PAI form), and provides IRF PAI preparation software to IRFs.

Department of Health and Human Services ("HHS").  HHS, through CMS, promulgates rules and regulations governing the nature and scope of services that are covered by Medicare and the requirements and conditions of payment that Medicare providers must meet.  *See generally* 42 C.F.R, Chapter IV.  CMS also publishes regulatory and interpretive guidance in the Federal Register and provides program instructions through policy manuals and other publications that further define the statutory and regulatory provisions governing Medicare with which providers must comply.

120.    The Medicare program is divided into four parts.  Medicare Part A (hospital insurance) covers inpatient hospital services, home health services, hospice care, and related post-hospital services such as skilled nursing and rehabilitation care.  *See generally* 42 U.S.C. §§ 1395c to 1395i-5.  Medicare Part B covers some medical expenses not covered under Part A, generally on an outpatient basis.  *See generally* 42 U.S.C. §§ 1395j to 1395w-6.  Medicare Part C covers the same benefits under Part A and Part B, but the services are provided through capitated health insurance plans.  *See generally* 42 U.S.C. §§ 1395w-21 to 1395w-29.  Medicare Part D covers prescription drug benefits.  *See generally* 42 U.S.C§§ 1395w-101 to 1395w-154.

**B.      Inpatient Rehabilitation Facilities (IRFs)**

**1.      Overview of IRFs**

121.    Inpatient Rehabilitation Facilities (IRFs) provide patients with intensive rehabilitation services using an interdisciplinary team approach in a hospital environment.  An IRF may be a free-standing facility or it may be a unit within a hospital.

122.    Admission to an IRF is only appropriate for patients with complex nursing, medical management, and rehabilitative needs who require intense therapy services.  Medicare will only

reimburse services that are "reasonable and necessary." *See generally* 42 U.S.C. § 1395y.  For

services provided to a patient to be reasonable and necessary, a patient must:

- Require the active and ongoing therapeutic intervention of multiple therapy disciplines;

- Generally require an intensive rehabilitation therapy program uniquely provided in IRFs;

- Be sufficiently medically stable to benefit from IRF services; and,

- Require close medical supervision by a physician for managing medical conditions to support participation in an intensive rehabilitation therapy program.

Centers for Medicare & Medicaid Services, *Inpatient Rehabilitation Facility Prospective Payment*

*System* (Jan. 2017).[10]  "[I]ntensive rehabilitation therapy" generally requires at least fifteen hours

(900 minutes) of therapy.  42 C.F.R. § 412.622(a)(3)(ii).  This is often referred to as the "900

minutes requirement."

123.    Only time spent in direct contact with a patient may count as therapy time for

purposes of meeting the 900 minutes requirement.  CMS has specifically stated that "time spent

documenting in a patient's medical record, unsupervised modalities, and significant periods of rest

are examples of time not spent in direct contact with a patient and, therefore, may not be used to

demonstrate the intensity of therapy requirement" for IRFs.  *See* Ex. 7, Follow-up Information

from the November 12, 2009 Provider Training Call, at 11.

124.    When a patient cannot participate in therapy, a so-called "brief exception" to the

900 minutes requirement can be granted, provided that the reasons for the break in therapy are

well-documented in the patient's medical record, and the minutes are "made up" later.  *See* Ex. 1,

---

[10]    *Available   at*   https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-
MLN/MLNProducts/downloads/InpatRehabPaymtfctsht09-508.pdf.

Medicare Benefit Policy Manual, at 37–38; Ex. 7, Follow-up Information from the November 12, 2009 Provider Training Call, at 14.  If this documentation is not provided, the brief exception will not be approved, the 900 minutes requirement will not be met, and the IRF claim will no longer be considered reasonable and necessary.  *See* 42 C.F.R. § 412.622(a)(3)(ii); Ex. 1, Medicare Benefit Policy Manual, at 37–38; Ex. 7, Follow-up Information from the November 12, 2009 Provider Training Call, at 14.

125.    For an IRF claim to be considered reasonable and necessary by CMS, a patient's medical record must also contain "a comprehensive preadmission screening."  42 C.F.R. § 412.622(a)(4)(i); *see also* Ex. 1, Medicare Benefit Policy Manual, at 31.  The preadmission screening—not an IRF stay itself—assesses whether a patient will benefit from an IRF stay.  *See* 42 C.F.R. §§ 412.622(a)(3), (4); Ex. 1, Medicare Benefit Policy Manual, at 33.  As a result, CMS has unequivocally stated that it will not pay for "trial" IRF admissions, because they are not reasonable and necessary.  *See* Ex. 1, Medicare Benefit Policy Manual, at 33.

126.    For an IRF to participate in the IRF Prospective Payment System (IRF PPS), discussed *infra*, at least sixty percent of its patients must be "Qualifying Admissions," meaning the patient must have one of the following 13 conditions that typically require rehabilitation therapy:

1.  Stroke

2.  Spinal cord injury

3.  Congenital deformity

4.  Amputation

5.  Major multiple trauma

6.  Fracture of femur (hip fracture)

7. Brain injury

8. Neurological disorders, including multiple sclerosis, motor neuron diseases, polyneuropathy, muscular dystrophy, and Parkinson's disease.

9. Burns

10. Active, polyarticular rheumatoid arthritis, psoriatic arthritis, and seronegative arthropathies resulting in significant functional impairment of ambulation and other activities of daily living that have not improved after an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission or that result from a systemic disease activation immediately before admission, but have the potential to improve with more intensive rehabilitation.

11. Systemic vasculidities with joint inflammation, resulting in significant functional impairment of ambulation and other activities of daily living that have not improved after an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission or that result from a systemic disease activation immediately before admission, but have the potential to improve with more intensive rehabilitation.

12. Severe or advanced osteoarthritis (osteoarthrosis or degenerative joint disease) involving two or more major weight bearing joints (elbow, shoulders, hips, or knees, but not counting a joint with a prosthesis) with joint deformity and substantial loss of range of motion, atrophy of muscles surrounding the joint, significant functional impairment of ambulation and other activities of daily living that have not improved after the patient has participated in an appropriate, aggressive, and sustained course of outpatient therapy services or services in other less intensive rehabilitation settings immediately preceding the inpatient rehabilitation admission but have the potential to improve with more intensive rehabilitation. (A joint replaced by a prosthesis no longer is considered to have osteoarthritis, or other arthritis, even though this condition was the reason for the joint replacement.)

13. Knee or hip joint replacement, or both, during an acute hospitalization immediately preceding the inpatient rehabilitation stay and also meet one or more of the following specific criteria:

   a. The patient underwent bilateral knee or bilateral hip joint replacement surgery during the acute hospital admission immediately preceding the IRF admission.

b. The patient is extremely obese with a Body Mass Index of at least 50 at the time of admission to the IRF.

c. The patient is age 85 or older at the time of admission to the IRF.

42 C.F.R. § 412.29(b)(2).

127.   Additionally, a patient may count as a Qualifying Admission even if the patient's etiologic diagnosis does not fall within one of the 13 conditions listed above.   If a patient has a severe comorbidity (a condition other than the diagnostic reason for the patient's admission to the IRF), then the patient may count towards the 60% threshold.   Medicare has defined the diagnosis (ICD-9 or ICD-10) codes that allow for a patient to be a qualifying admission based upon an etiologic diagnosis or comorbid condition.   *See* Ex. 2, List of presumptive diagnosis codes for Fiscal Year 2018.   The following table shows the nine myopathy[11] diagnosis codes on that list:

| ICD-9 | Description |
|-------|-------------|
| 359.21 | Myotonic muscular dystrophy |
| 359.22 | Myotonia congenital |
| 359.23 | Myotonic chondrodystrophy |
| 359.24 | Drug-induced myotonia |
| 359.4 | Toxic myopathy |
| 359.5 | Myopathy in endrocrine diseases classified elsewhere |
| 359.6 | Symptomatic inflammatory myopathy in diseases classified elsewhere |
| 359.81 | Critical illness myopathy ["CIM"] |
| 359.89 | Other myopathies |

128.   To qualify for the IRF PPS, a facility must also have a Director of Rehabilitation who, among other requirements, is a "doctor of medicine or osteopathy . . . licensed under State law to practice medicine or surgery".   42 C.F.R. §§ 412.29(g)(2), (3).

---

[11] Myopathy is a disease of the muscle in which the muscle fibers do not function properly. Muscle weakness is a symptom of myopathy, but muscle weakness without further tests is not a reason for diagnosing myopathy. *See, e.g.*, Ex. 16, Aaron Saguil, *Evaluation of the Patient with Muscle Weakness*, 71 American Family Physician 7, 1327-36 (Apr. 1, 2005).

### 2.      Patient Evaluation and Claim Submission Process

129.    When a patient is admitted to an IRF, the patient is evaluated using the Patient Assessment Instrument ("PAI" or "IRF PAI").  *See* 42 C.F.R. § 412.604(c); Ex. 3, IRF PAI.  The PAI is used to collect clinical, demographic, medical, and other information about the patient, which ultimately classifies the patient into a distinct group based on clinical characteristics.  The group into which the patient is classified ultimately determines the appropriate corresponding Medicare payment rate.

130.    IRFs use the PAI to code each patient with the appropriate Impairment Group Code (IGC), the etiologic diagnosis (the diagnostic reason for the patient to be admitted to the IRF), and any other diagnoses or conditions that the patient may have for purposes of recording comorbidities.  *See id.*

131.    Once the PAI is completed, the data is entered into a grouper software, such as UDS, which classifies the patient into a Rehab Impairment Classification code (RIC).  After a patient is classified into an RIC, the IRF uses additional information from the PAI, such as motor scores and cognitive scores, to classify a patient into a Case Mix Group (CMG), which is ultimately used to price the claim that is submitted to Medicare.  *See* Inpatient Rehabilitation Facility Prospective Payment System for Federal Fiscal Year 2017, 81 Fed. Reg. 52056, 52076–77 (Aug. 5, 2016) (showing payment rates for Fiscal Year 2017 by CMG); Ex. 4, CMS IRF-PAI Training Manual (Oct. 1, 2012), at I-4.

132.    The PAI includes a section called the Functional Independence Measure ("FIM") Instrument.  Ex. 3, IRF PAI, at 2.  The FIM Instrument contains eighteen scored items assessing self-care, movement, communication, and other factors that speak to patient independence.  *See id.*  Each of these items receives a score from 1 (total assistance needed) to 7 (complete

independence). *Id.* These scores, referred to as "FIM scores," are measured twice. A patient's

FIM scores are measured first at admission, and a goal FIM is assigned to the patient. *Id.* FIM

scores are measured again at discharge. *Id.*

133. PAI FIM scores must correspond with information provided in a patient's IRF

medical record and must be accurate. *See* 42 C.F.R. § 412.610(e); Ex. 1, Medicare Benefit Policy

Manual, at 35; Ex. 14, IRF PAI Training Manual § 9 (2016), at 1 ("All responses [to required IRF

PAI items] should have supporting documentation in the patient's medical record.")

134. The PAI also includes mandatory quality reporting items, including influenza

vaccination status, falls during a patient's IRF stay, and pressure ulcer information. *See* Ex. 3, IRF

PAI, at 11, 15–17; Ex. 14, IRF PAI Training Manual § 9 (2016), at 1, 8–9. These mandatory items

are "required for determining payment, quality measure calculation, or internal consistency

checks" and "should have supporting documentation in the patient's medical record." Ex. 14, IRF

PAI Training Manual § 9 (2016), at 1.

135. CMS guidance dictates that the discharge PAI should utilize the lowest FIM scores

during the three calendar days which comprise the discharge assessment period. Ex. 4, CMS IRF-

PAI Training Manual, at III – 3. Discharge FIM scores, and scores showing whether a patient met

designated mobility and self-care goals, are a mandatory IRF PAI quality reporting measure, found

in Section GG of the discharge IRF PAI. *See* Ex. 3, IRF PAI, at 12–14; Ex. 14, IRF PAI Training

Manual § 9 (2016), at 6–7; *see also* 42 U.S.C. § 1395lll(b)(1)(B)(i).

## C.    IRF Prospective Payment System (IRF PPS)

### 1.    Overview

136. Medicare's Inpatient Prospective Payment System (IPPS) for acute care hospitals

pays a fixed amount for a hospital stay. In 2002, Medicare made IRFs exempt from the IPPS and

implemented a different prospective payment system specifically for IRFs called the IRF Prospective Payment System (IRF PPS). Under the IRF PPS, IRFs are reimbursed at a much higher rate, but must meet certain requirements in order to obtain this higher reimbursement rate.

### 2. Compliance with the Sixty Percent Rule

137. The primary criteria that IRFs must meet in order to be paid under the IRF PPS is referred to as the "60% Rule," meaning that at least sixty percent of an IRF's total inpatient population must require treatment for one or more of the 13 medical conditions listed *supra* in Paragraph 126. Compliance with the 60% Rule is measured annually, and the compliance period for a facility is based upon its cost report period. All facilities accepting Medicare payments must file an annual cost report,[12] and the timeframe varies by facility. A facility must know by the beginning of the Cost Report period if it is compliant with the 60% Rule, so Medicare makes the end of the compliance period 4 months prior to the start of the Cost Report period.[13]

138. If Medicare is the payer for at least 50% of an IRF's discharges, then only the Medicare discharges are used to determine compliance. If Medicare is the payer for less than 50% of the IRF's discharges, then all discharges (including those paid by Medicaid or private insurance) are used to determine compliance. Most IRFs service a majority of elderly patients, and the Medicare-only discharges are most often used to determine compliance.

139. Medicare has subcontracted the determination of 60% Rule compliance to various Medicare Administrative Contractors (MACs), which have the option of performing compliance testing in one of two ways: (1) the presumptive method, in which the MAC uses a CMS software

---

[12] Medicare cost reports are used to report expenses for different types of facilities receiving Medicare reimbursement, such as hospitals.

[13] For example, if a cost report period begins on January 1, the end of the compliance period would be August 31 of the prior year. As a result, the compliance period would then be September 1 through August 31.

program to analyze the IRF PPS impairment group codes, etiologic diagnosis, and comorbidity codes; or (2) a review of medical records, in which the MAC analyzes a random sample of medical records that represent patients the IRF treated during the compliance review time period.

140.   MACs determine whether an IRF is compliant with the 60% Rule at the beginning of each annual cost reporting period, and that determination remains in effect for the duration of that cost reporting period. *See* CMS, *Specifications for Determining IRF "60% Rule" Compliance* (Oct. 1, 2015).[14]  MACs use the following general steps to determine compliance:

1. A compliance review period is defined based upon the facility's cost reporting period.

2. All IRF-PAI assessments from a given compliance review period are selected.

3. Each selected assessment is categorized as either meeting or not meeting IRF criteria based upon the impairment groups and ICD codes listed on the assessment.

4. A compliance percentage is calculated based upon the number of selected assessments that met the IRF criteria.

5. If the IRF's calculated compliance percentage exceeds 60 percent, then the facility presumptively meets the 60% Rule. Whether the percentage exceeds 60 percent or not, the MAC may always choose to determine compliance using the medical review methodology. If the percentage does not exceed 60 percent, then the MAC must use the medical review methodology.

*Id.*

141.   If the MAC determines that an IRF is not in compliance with the 60% Rule, the facility's classification as an IRF is terminated, and the facility is paid lower rates under the inpatient prospective payment system (IPPS).

---

[14]   *Available for download at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/InpatientRehabFacPPS/Downloads/IRF_Compliance_Rule_Spec_102015.zip

142.    An IRF which is improperly paid under the IRF PPS, instead of the IPPS, has been overpaid, and is obligated to return the overpayment to CMS. *See* 42 C.F.R. § 401.305(b).

**3.    Other Requirements**

143.    Other IRF PPS requirements are set out in Subpart P of Chapter IV of Title 42 of the Code of Federal Regulations, and include the following.

144.    At the time that each patient is admitted, the IRF "must have physician orders for the patient's care during the entire time that the patient is hospitalized." 42 C.F.R. § 412.606(a).

145.    An IRF must also complete an IRF PAI for each admitted Medicare patient as a condition of payment under the IRF PPS. *See* 42 C.F.R. § 412.604(c). If this condition is not met, CMS or a Medicare intermediary may withhold or reduce payment to the IRF, or classify the IRF as an inpatient hospital and reimburse it under the IPPS. *See* 42 C.F.R. § 412.604(a)(2).

146.    A person trained to perform a patient assessment using the PAI "must record appropriate and applicable data accurately and completely for each item on the patient assessment instrument." 42 C.F.R. § 412.606(c)(2). The encoded PAI data "must accurately reflect the patient's status at the time of the patient assessment." 42 C.F.R. § 412.610(e).

147.    Discharge assessments must be completed on the fifth day after the patient is discharged or stops receiving Medicare IRF services. 42 C.F.R. § 412.610(c)(2). The discharge assessment must cover three calendar days that include the date that the patient is discharged or stops receiving Medicare IRF services, as well as the two days that precede it. *See id.*

148.    PAIs must be encoded no more than seven days after the completion dates for the admission and discharge assessments. *See* 42 C.F.R. §§ 412.610(c), (d).

### 4.     Payment Rates

149.     The payment rate for each patient under the IRF PPS depends on the CMG to which the patient is assigned.  Patients are assigned to one of four tiers within the CMG according to comorbidities.  Centers for Medicare & Medicaid Services, *Inpatient Rehabilitation Facility Prospective Payment System* (Jan. 2017).[15]  Each tier adds a successively higher payment amount to the case depending on whether the costs of the comorbidity are significantly higher than other cases in the same CMG (low, medium, or high).  *Id.*

150.     Payment rates are published in the Federal Register.  *See* Inpatient Rehabilitation Facility Prospective Payment System for Federal Fiscal Year 2017, 81 Fed. Reg. 52056, 52076–77 tbl.5 (Aug. 5, 2016) (showing payment rates for Fiscal Year 2017); *see also* Inpatient Rehabilitation Facility Prospective Payment System for Federal Fiscal Year 2016, 80 Fed. Reg. 47035, 47076 tbl.16 (Aug. 6, 2015) (showing payment rates for Fiscal Year 2016).  Services for patients with comorbidities are reimbursed at a higher rate.  *See id.*

151.     Payment rates under the IRF PPS are adjusted on an annual basis to reflect inflation and changes in local wage rates.  *See* Centers for Medicare & Medicaid Services, *Inpatient Rehabilitation Facility Prospective Payment System* (Jan. 2017).[16]

---

[15]     *Available    at*    https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/InpatRehabPaymtfctsht09-508.pdf
[16]     *Available    at*    https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/InpatRehabPaymtfctsht09-508.pdf.

**D.     Certifications**

**1.     Medicare Provider Enrollment Agreement**

152.     Any health care provider seeking to enroll in the Medicare program is required to

sign a provider agreement with Medicare.  *See* 42 C.F.R. § 489.10.  Specifically, hospitals must

sign Form CMS-855A, which contains the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to
> this provider. The Medicare laws, regulations, and program instructions are available
> through the Medicare contractor. **I understand that payment of a claim by Medicare is
> conditioned upon the claim and the underlying transaction complying with such laws,
> regulations and program instructions** (including but not limited to, the Federal anti-
> kickback statute and the Stark law), **and on the provider's compliance with all
> applicable conditions of participation in Medicare.**

*See* Medicare Enrollment Application, Institutional Providers, CMS-855A (emphasis added).  The

provider agreement makes it clear that payment is conditioned upon compliance with all applicable

laws, regulations, and program instructions.

153.     Medicare regulations provide that CMS may suspend payments to providers based

upon a finding of a credible allegation of fraud.  *See* 42 C.F.R. §§ 405.370, 405.731.  CMS may

also recoup or offset payments as a result of any fraud resulting in overpayments by Medicare.

*See generally* 42 C.F.R. Subpart C.

**2.     Patient Assessment Instruments**

154.     When an IRF submits a PAI to CMS through the grouper system, it makes the

following certification:

> "**I certify that the accompanying information accurately reflects patient assessment
> information for this patient** and that I collected or coordinated collection of this
> information on the dates specified. To the best of my knowledge, **this information was
> collected in accordance with applicable Medicare and Medicaid requirements. I
> understand that this information is used** as a basis for ensuring that patients receive
> appropriate and quality care, and **as a basis for payment from federal funds. I further
> understand that payment of such federal funds and continued participation in the
> government-funded health care programs is conditioned on the accuracy and**

42

> **truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information.**"

Ex. 3, IRF PAI, at 18 (emphasis added).

### 3.   IRF Prospective Payment System Enrollment and Attestation Statements

155.    When seeking to participate in the IRF PPS, and on an annual basis thereafter, an IRF must submit either CMS Form 437A (for IRF units located in a hospital) or CMS Form 437B (for freestanding IRFs).  *See* Ex. 5, CMS Form 437A; *see also* Ex. 6, CMS Form 437B. Prospective IRF facilities and units must certify in writing that the population they intend to serve meets the criteria outlined in 42 C.F.R. § 412.29(b).  *See id.*  IRF facilities and units already participating in the IRF PPS must annually certify that they served an inpatient population that meets the criteria outlined in 42 C.F.R. § 412.29(b) during their most recent compliance period. *Id.*

156.    IRFs must also submit an Attestation Statement signed by the Director of Rehabilitation and either the Administrator or hospital CEO, both when seeking to participate in the IRF PPS and on an annual basis thereafter.  The Attestation Statement contains the following:

> Based upon our personal knowledge and belief, we attest that the responses on the attached Rehabilitation Criteria work sheet (Form CMS 437A or CMS 437B) are true and correct, and that [the IRF unit or facility] has met, meets and will continue to meet all the applicable requirements for exclusion from the IPPS for the period beginning (first day of hospital's fiscal year or cost reporting period), as set out in Subpart B of 42 CFR Part 412.
>
> ***
>
> We agree that if our inpatient rehabilitation facility (IRF) fails to meet any of these requirements in the next three cost report years, we will notify our Regional Office and Medicare Administrative Contractor / Fiscal Intermediary (MAC/FI) of the change immediately in order to permit a valid determination of the IPPS excluded status prior to the beginning of the next cost reporting period.

\*\*\*

> STATEMENTS OR ENTRIES GENERALLY: Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statement or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both. (18 U.S.C., Sec. 1001).

Memorandum from the Center for Medicare & Medicaid Services, Collection of Information from Inpatient Rehabilitation Facilities to State Survey Agency Directors (Nov. 30, 2012) (on file with the author).

### 4.     Form CMS 1450 (UB04)

157.    IRFs may submit Medicare claims electronically using the 837 institutional claim format (837I) or may submit a claim on paper using form CMS-1450, also known as form UB04. Claim form CMS-1450 requires providers, including IRFs, to certify that the information being submitted is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."    It also states: "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Form CMS-1450 (emphasis in original).

### VIII.   DEFENDANTS' FRAUD ON THE GOVERNMENT

158.    Defendants falsified or fraudulently misrepresented patients' medical diagnoses and conditions in assessments and claims submitted to CMS.  Defendants also used false and/or

fraudulent claims, records, and certifications in order to obtain and maintain payments under the more lucrative IRF PPS.

159.    In particular, Defendants:  (1) utilized false and/or fraudulent myopathy diagnoses to obtain and maintain IRF PPS payments; (2) admitted patients on a "trial basis" in order to comply with the 60% Rule; (3) submitted claims to CMS for services not provided; (4) submitted false and/or fraudulent IRF PAIs to CMS; (5) submitted claims to CMS for care which was not reasonable or necessary; (6) submitted claims to CMS for treatment of patients with missing or backdated physician admission orders; and (7) employed unqualified directors of rehabilitation.

A.    **Defendants Submitted Claims and Certifications to CMS Based on False and/or Fraudulent Myopathy Diagnoses**

160.    In an Internet training session ("Webex") for PPS coordinators and other staff at all HCA IRFs on March 22, 2017, HCA's Clinical Services Director Lisa Roberts ("Roberts") instructed employees to rely on physical symptoms, rather than diagnostic tests and criteria, when presenting patients to a physician for diagnosis with critical illness myopathy (CIM).  *See* Ex. 15, March 22, 2017 Webex Transcript, at 5:9–6:24.  Patients with CIM may show the symptoms Roberts discussed, but those symptoms may also indicate a number of other possible diagnoses. At no point did the Webex cover the diagnostic criteria or documentation needed to clearly identify which patients to diagnose with CIM.  *See id.*

161.    For example, Roberts told employees to look at possible muscle weakness of three specific muscle groups, and, if a patient had all three, then the patient was likely to have CIM.  *See* Ex. 15, March 22, 2017 Webex Transcript, at 5:9–6:4.  Muscle weakness alone, however, is not determinative of myopathy. In fact, there are many potential causes of muscle weakness, including "infectious, neurologic, endocrine, inflammatory, rheumatologic, genetic, metabolic, electrolyte-induced, or drug-induced" causes.  *See, e.g.*, Ex. 16, at 1327.

45

162.    A physician assisting with the Webex, Dr. Abel, also recommended a simple "clinical exam" rather than muscle biopsies or other diagnostic criteria as a means of diagnosing CIM.    Ex. 15, March 22, 2017 Webex Transcript, at 20:15.    Dr. Abel further stated: "Unfortunately, like a lot of areas in rehabilitation, we don't have data to support what we do, but we do know the benefits are great for the diagnosis of [CIM], the polyneuropathy." Ex. 15, March 22, 2017 Webex Transcript, at 22:6–22:10.

163.    Based on Relator's experience, prior to this Webex, HCA IRFs used a debility diagnosis for such patients, which, unlike CIM, is not a qualifying diagnosis for purposes of complying with the 60% Rule.  In fact, near the end of the Webex, the Webex moderator read a comment stating that the presentation was "timely," because the commenter's facility would be admitting a patient that day under myopathy, and not debility.  Ex. 15, March 22, 2017 Webex Transcript, at 22:22.

164.    Following the Webex, Mark Rozell, Regional Vice President of Operations for HCA's Gulf Coast Division, informed Relator that one physician at Bayshore previously refused to diagnose CIM without utilizing a muscle biopsy, but was "made" to "change his mind."  Rozell also informed Relator that HCA "corporate" wanted Bayshore to know what was outlined in the Webex.

165.    In May of 2017, Relator learned that some HCA IRFs were using myopathy diagnoses without proper documentation in order to bring up the number of compliant admissions and meet the 60% Rule.  Specifically, clinical rehabilitation specialists at Kingwood Medical Center, among other facilities, fraudulently utilized myopathy diagnoses at a high rate in order to comply with the 60% Rule.

166.    In response to the directive to rely on the "three muscle groups" criterion when suggesting that patients have myopathy, as taught by the Webex, Relator created a PowerPoint presentation in May of 2017 based on six recent medical journal articles regarding the accepted medical standards for diagnosis of myopathy in order to help educate Bayshore's clinical rehabilitation specialists on the subject. *See* Ex. 11, Relator's Myopathy PowerPoint Presentation. The presentation detailed how to assign Medical Research Council ("MRC") scores as part of diagnosis, how to document results, and how to present the results to a physician for diagnosis. *Id.* In particular, the PowerPoint showed that a muscle biopsy is the accepted industry standard for diagnosis of CIM. *Id.* The PowerPoint shows that because HCA IRFs did not use MRC score assessments, CIM was arbitrarily diagnosed by HCA.

167.    Additionally, Simmons responded to Relator's PowerPoint by stating that Bayshore would never "get out from the bottom of the barrel" if it utilized the procedures outlined in the PowerPoint, presumably because Bayshore would not be able to comply with the 60% Rule and be paid under the more lucrative IRF PPS.

168.    In late June of 2017, Rozell told Relator that another HCA IRF in the Gulf Coast Division was compliant with the 60% Rule, and "knew how to use" myopathy diagnoses. He directed Crystal Reiser of Kingwood Medical Center to send Relator information about diagnosing myopathy. Reiser e-mailed a list of medical conditions to Relator, and stated that a physiatrist in the Gulf Coast Division named Dr. Grogan "approved of this e-mail."

169.    Additionally, physicians at Bayshore Medical Center were pressured to utilize myopathy diagnoses when admitting patients.

170.    For example, on or around June 25, 2017, Dr. Remington Lee told Relator that he had been asked to admit a patient with a diagnosis of myopathy, but could not and would not do

this. The next day, however, the patient was admitted under a diagnosis of "disuse myopathy" under "other specified myopathies." Ex. 10, Text Messages From Kathryn Simmons (March 24–June 27, 2017), at 11.

171.    Potentially all HCA IRFs are using the flawed diagnostic methods illustrated in the Webex, and promulgated by HCA corporate, to fraudulently diagnose Medicare patients with myopathy and bring them into compliance with the 60% Rule.

172.    If an IRF does not comply with the 60% Rule, it is reimbursed under the IPPS payment model, which pays providers at a lower overall rate than the IRF PPS.

**B.    Defendants Admitted 60%-Rule-Compliant Patients on a "Trial Basis" in Order to Boost 60% Rule Compliance Rates.**

173.    Some patients were admitted to HCA IRFs on a so-called "trial basis"—in order to determine whether the patient would benefit from the intensive therapy provided in an IRF. Some of these trial admissions were done specifically to improve the IRFs' compliance with the 60% Rule. However, CMS guidance states that "trial" basis admissions are not reasonable or necessary medical treatment, and CMS will not pay for them. *See* Ex. 1, Medicare Benefit Policy Manual, at 33.

174.    For example, in April of 2017, Bayshore admitted an uninsured patient, Patient One, on a "trial basis" for three days, because she had a 60%-Rule-compliant diagnosis and would improve Bayshore's compliance rate.

**C.    Defendants Submitted Claims to CMS for Services Not Provided**

175.    When submitting a claim for IRF services and an IRF PAI, HCA IRFs submit a statement of the minutes of each type of therapy provided to a patient, such as occupational therapy. *See* Ex. 3, IRF PAI, at 3. This is included to document the "intensity of therapy"

requirement for IRFs, demonstrated by the provision of a certain number and frequency of minutes of therapy—typically 900 minutes. *See* Ex. 1, Medicare Benefit Policy Manual, at 36–37.

176.    At HCA IRFs, some therapists would jointly provide therapy, and then separately record the entire amount of therapy as their own. So, for example, if a speech therapist and occupational therapist worked with a patient together for thirty minutes, each therapist would record that she provided thirty minutes of therapy. However, CMS guidance dictates that such co-treatment should be recorded as fifteen minutes for the speech therapist and fifteen minutes for the occupational therapist. *See* Ex. 7, Follow-up Information from the November 12, 2009 Provider Training Call, at 11. HCA IRFs effectively doubled the minutes of therapy provided in such a situation and therefore billed Medicare for services not provided.

177.    For example, at Bayshore Medical Center in 2017, speech and language pathologist Dana Molinsky reported to Relator that an occupational therapist named Andy utilized this billing structure to "overlap" treatment times with her in Meditech, HCA's medical records system.

178.    Additionally, therapists at HCA IRFs fraudulently recorded time spent on breaks or on medical documentation as time spent on therapy that counted towards the 900 minutes requirement.

179.    For example, therapists at Bayshore have recorded, and continue to record, time spent on medical documentation as time spent on therapy.

180.    Incredibly, some HCA IRFs also counted time that patients spent eating breakfast unsupervised as group therapy time. Patients would eat breakfast together, while the therapists would eat at a separate table ten to twenty feet away.

181.    For example, in the Summer of 2016 and from November 2016 to the present, Bayshore's therapists recorded patients' unsupervised breakfast time on Thursday mornings as

"group therapy" that counted towards the 900 minutes requirement.  Bayshore submitted claims for treatment of the following patients that include unsupervised breakfast time as "group therapy":

| Patient's Last Name | Approximate IRF Treatment Dates |
| --- | --- |
| Patient Two | March 2017 |
| Patient Three | March 2017 |
| Patient Four | March 2017 |
| Patient Five | March 2017 |
| Patient Six | March 2017 |
| Patient Seven | March 2017 |
| Patient Eight | March 2017 |
| Patient Nine | March 2017 |
| Patient Ten | March 2017 |
| Patient Eleven | March 2017 |
| Patient Twelve | March 2017 |
| Patient Thirteen | March 2017 |

Therapists at Bayshore ate at a separate table from the patients.  Before the area was renovated in the Summer of 2016, the tables were separated by a four-foot barrier which obscured the patients from supervision.  And, even after the renovation, the tables were still set apart from each other. On one occasion, a patient began choking on food, and the therapists only noticed this when a passing nurse notified them.

182.    These practices directly contravene CMS' definition of therapy time and constitute services not provided.  *See* Ex. 7, Follow-up Information from the November 12 Provider Training Call, at 11.

**D.    Defendants Submitted False and/or Fraudulent IRF PAIs to CMS**

183.    At HCA IRFs, PPS coordinators were instructed to use the *highest* FIM score from the last three days of a patient's stay on the patient's discharge IRF PAI, rather than the *lowest*

score from the last three days. This practice not only contravenes CMS guidance,[17] but also fraudulently represents the patient's degree of functional improvement for a mandatory quality reporting measure—the "Functional Abilities and Goals" section of the discharge IRF PAI. *See* Ex. 3, IRF PAI, at 12–14 (discharge functional abilities and goals section of IRF PAI); Ex. 14, IRF PAI Training Manual § 9 (2016), at 1, 7 (discharge functional abilities and goals section of IRF PAI is mandatory).

184. For example, in early 2017, Relator was trained by Mark Rozell and Madalynn Harry, Bayshore's outgoing IRF PAI Coordinator, to use the highest discharge FIM from the last three days of a patient's stay, instead of the lowest, on discharge IRF PAIs. On April 20, 2017, Rozell also confirmed that Relator should use the highest discharge FIM for a patient.

185. Defendants also submitted PAIs with FIM scores, information, and diagnoses that were changed long after the completion dates specified in 42 C.F.R. § 412.610. In particular, some PAIs were altered weeks or months after a patient's discharge, in direct contravention of 42 C.F.R. § 412.610.

186. For example, at Bayshore Medical Center in 2016 and 2017, PPS coordinators were directed to change diagnosis codes and discharge FIM scores in some IRF PAIs weeks or months after discharge, in order to bring up Bayshore's compliance ratio and meet the requirements of the 60% Rule. In 2017, these altered PAIs were submitted to CMS under Simmons' direction—with the exception of PAIs that Relator refused to change. Relator understands that, for each IRF PAI with an altered diagnosis, the corresponding UBO-4 claim form will contain a different, non-60%-Rule-compliant diagnosis.

---

[17] *See, e.g.*, Ex. 4, CMS IRF-PAI Training Manual, at III – 3; Ex. 14, IRF PAI Training Manual § 9 (2016), at 1.

187.    Defendants also submitted PAIs to CMS containing FIM scores which are not reflected in patients' medical records.   Staff were not trained to enter certain FIM score information—such as bowel or bladder information—into Meditech.   PPS coordinators were forced to orally gather FIM score information from staff because of this absence, and submitted claims with FIM scores based only on this information gathering—not on medical records.

188.    Additionally, due to this same deficiency in medical records, some PPS coordinators simply fabricated FIM scores and submitted the resulting false PAIs to CMS.

189.    For example, nursing staff at Bayshore were not trained to enter patients' bowel or bladder information into Meditech.  Instead, Meditech would autopopulate bowel and bladder level of assistance FIM fields in the UDS software used to complete PAIs.  Bowel and bladder accident information required data input from nursing staff, however, and because the staff did not fill in the information, it did not populate into the PAI.  As a result, PPS coordinators had to ask for patients' bowel or bladder FIM scores from nursing staff for each PAI.  This led to PAIs being submitted with bowel/bladder FIM scores that had no documentation in patients' medical records. Prior to January of 2017, PPS coordinators at Bayshore did not ask the nursing staff for bowel and bladder information, meaning that the PAIs submitted by those PPS coordinators contain falsified FIM scores.  Some patients had no bowel information entered because they had not, in fact, had a bowel movement during their IRF stay.  While it was Bayshore's policy to give patients a laxative if they had not had a bowel movement during the first five days of their IRF stay, this required a physician's prescription.   Bayshore's staff was not diligent in requesting or issuing laxative prescriptions, which led to some patients—even young patients—having no bowel movements during their entire IRF stay, adversely impacting patient health.

190.    Defendants also submitted IRF PAIs to CMS with false information about patients' ability to bathe or shower independently.  A patient's "ability to bathe self in shower or tub" must be assessed at admission and at discharge and recorded in Section GG of the IRF PAI.  Ex. 3, IRF PAI, at 7, 12.  Relator observed, however, that the number of bathing ability scores recorded for some patients outnumbered the actual number of times that the patients had bathed or showered during their IRF stay.

191.    For example, in early 2017 at Bayshore, Rehabilitation Supervisor Jill Winter— Relator's supervisor at the time—told Relator that she did not have to give patients a shower to determine their bathing ability scores, saying "you already know [what the patient's bathing ability score is] if you know their total number of shower transfers."  Shower or tub transfers are a separate IRF PAI measure, and the IRF PAI specifically states that the bathing ability score does not include shower or tub transfers.  *See* Ex. 3, IRF PAI, at 7, 12.

192.    Additionally, in March of 2017, Patient Fourteen had a shower on his admission day, and had bathing ability scores recorded for admission and each of the two weeks afterwards. However, Patient Fourteen complained to Occupational Therapist Lilia Cuellar-Bailey that he had not showered in two weeks.  Patient Fourteen was a cognitively aware patient with no known memory deficits.  This indicates that Patient Fourteen's bathing ability scores for each week following admission were not based on any actual bathing, and are false.

193.    Nursing staff at HCA IRFs were not properly trained in how to enter patient pressure ulcer information into Meditech, or even about the difference between a wound and a

pressure ulcer.[18]  This resulted in the submission of false pressure ulcer scores, some of which differed so much from the patients' actual condition that they are false.

194.    For example, at Bayshore Medical Center, before January 2017, the nursing staff was not instructed about the difference between a pressure ulcer and a wound or the proper way to document pressure ulcers in Meditech.  Some nursing staff even thought that a pressure sore was the same as a wound.  This pressure sore information in Meditech was "autopopulated" into patients' PAIs so that they contain wildly variant pressure sore information, misrepresenting a required quality reporting item.[19]

195.    Defendants also submitted PAIs which omitted or made false statements about whether patients had fallen during their IRF stay, a mandatory IRF PAI quality measure,[20] even when other records reflected that the patients had fallen.

196.    Prior to January of 2017, for example, some Bayshore Medical Center patients had falls recorded in Meditech.  However, the patients' PAIs reported no falls.  These PAIs were submitted to CMS without correcting the discrepancy.  Relator noticed, for example, that Patient Fifteen had five falls recorded in Meditech, but none noted on her PAI.

---

[18] Section M of the IRF PAI requires entry of information about patients' pressure ulcers.  *See* Ex. 3, IRF PAI, at 11, 15–17.

[19] *See* Ex. 3, IRF PAI, at 11, 15–17; Ex. 14, IRF PAI training manual § 9 (2016), at 8–9 (some pressure ulcer reporting is mandatory).  *See also* 42 U.S.C. 1395lll(b)(2)(B)(iv) (requiring report of "medical conditions and co-morbidities, such as . . . pressure ulcers" no later than October 1, 2018).

[20] Section J of a patient's discharge IRF PAI records whether a patient had "any falls since admission".  Ex. 3, IRF PAI, at 15.  This is a mandatory IRF PAI item.  *See* Ex. 14, IRF PAI training manual § 9 (2016), at 8.

197.    Similarly, Defendants also submitted PAIs with false information about whether patients had been vaccinated for influenza prior to or during their IRF stay, another mandatory IRF PAI quality measure.[21]

198.    For example, at Bayshore Medical Center, some PAIs submitted to CMS prior to January of 2017 falsely certified that patients had received influenza vaccinations.

199.    Additionally, many patient files at HCA IRFs lacked discharge "Care Tool" assessments.  These assessments are used by HCA IRFs' PPS coordinators to complete required IRF PAI information regarding a patient's level of functioning at discharge.

200.    For example, some of the discharge IRF PAIs that Bayshore Medical Center submitted to CMS between January 1, 2017 and February 23, 2017 contained inaccurate or incomplete information about patients' functional levels at discharge.

**E.      Defendants Submitted Claims to CMS for Care Which Was Not Reasonable or Necessary**

201.    CMS will not pay for care which is not reasonable or necessary.  *See generally* 42 U.S.C. § 1395y.  As explained below, HCA and HCA IRFs submitted claims to CMS which—per 42 C.F.R. § 412.622—were not for reasonable or necessary medical services.

202.    Defendants submitted IRF PAIs and IRF claims to CMS which did not meet the minimum "900 minutes requirement" for intensive therapy, as set out in 42 C.F.R. § 412.622(a)(3)(ii).  Minutes of therapy were in some cases misrepresented, as explained previously. In other instances, claims were submitted which simply did not reflect at least 900 minutes of therapy, with the goal of "slipping" this deficiency past CMS and its intermediaries.

---

[21] Section O of the IRF PAI requires IRFs to report whether patients received influenza vaccinations during certain times of the year.  *See* Ex. 3, IRF PAI, at 17; Ex. 13, Appendix O to 2016 IRF PAI training manual, at 3; Ex. 14, IRF PAI training manual § 9 (2016), at 9.

203.    For example, Bayshore Medical Center submitted claims to CMS for the following

patients, who each had less than 900 total minutes of therapy.

| Patient Name (Last, First) | Approximate IRF Treatment Dates | Total Minutes of Therapy |
|---|---|---|
| Patient Sixteen | Early 2017 | less than 900 |
| Patient Seventeen | Early 2017 | less than 900 |
| Patient Eighteen | Early 2017 | less than 900 |
| Patient Nineteen | Early 2017 | less than 900 |
| Patient Twenty | Early 2017 | less than 900 |
| Patient Twenty-one | Early 2017 | less than 900 |
| Patient Twenty-two | Early 2017 | less than 900 |
| Patient Twenty-three | Early 2017 | less than 900 |
| Patient Twenty-four | Spring of 2017 | 885 |
| Patient Twenty-five | Spring of 2017 | 855 |
| Patient Twenty-six | Spring of 2017 | 855 |

Relator suggested to Simmons that Patient Twenty-six should be declared a loss, because

documentation did not show 900 minutes of therapy.   Simmons, however, directed Relator to

submit a claim for Patient Twenty-six regardless, stating incorrectly that CMS would simply

reduce payment on the claim.   CMS paid Bayshore's claim for Patient Twenty-six.

204.    Additionally, while assisting with selecting patient records for a UDS audit of

Bayshore in late June of 2017, Relator observed that most of the charts she reviewed did not meet

the 900 minutes requirement.

205.    HCA IRFs also submitted claims to CMS that failed to document why a patient

missed therapy, as required by the "brief exceptions policy."[22]   Additionally, HCA IRFs did not

properly document "make up" minutes under this policy.

206.    For example, prior to April 2017, Bayshore Medical Center submitted claims for

patients who had missed therapy, but had no documentation in their medical record as to why the

---

[22] *See* Ex. 1, Medicare Benefit Policy Manual, at 37–38 ("If these reasons are appropriately
documented in the patient's IRF medical record, such a break in service (of limited duration) will
not affect the determination of the medical necessity of the IRF admission.")

"brief exceptions policy" should apply, rendering these IRF stays medically unnecessary because they did not meet the intensity of therapy requirement. *See* 42 C.F.R. § 412.622(a)(3)(ii); Ex. 1, Medicare Benefit Policy Manual, at 37–38; Ex. 7, Follow-up Information from the November 12, 2009 Provider Training Call, at 14.

207.   Additionally, Bayshore Medical Center has submitted claims to CMS that include "make up" minutes under the brief exceptions policy but has failed to document which minutes are "make up" minutes and which are not. This practice fails to meet the requirements of the brief exceptions policy and means that these claims are neither reasonable nor necessary. *See id.*

## F.   Defendants Submitted Claims to CMS for Treatment of Patients Without Physician Admission Orders, or With Backdated Admission Orders

208.   IRFs must have physician orders at the time of each patient's admission, prior to providing any care. *See* 42 C.F.R. § 412.606(a).

209.   However, based on Relator's experience and review of records, prior to 2017, Defendants admitted some patients without physician orders and submitted claims to CMS for treatment of these patients.

210.   Additionally, upon discovering that some patient files lacked signed physician orders, Defendants procured backdated physician orders for these patients.[23] The orders were backdated to the date of the patient's admission. Thus, Defendants fraudulently represented to CMS that these patients had a doctor's order at the time of admission and before care was provided.

---

[23] Electronically scanned versions of the doctors' orders will reveal that they are backdated. The Healthcare Information Management department of Bayshore, for example, scans all paper documents very soon after they are created. For backdated doctor's orders, the scan date will be much later than the date filled in on the doctor's order.

211.    For example, Bayshore Medical Center admitted Patient Twenty-seven on April 1, 2017 without a physician order and submitted a backdated physician admission order with his IRF PAI to CMS at Kathryn Simmons' instruction.

212.    Furthermore, while working at Bayshore in the Summer of 2017 as a PPS Coordinator, Relator "flagged" five PAIs that had been submitted to CMS as missing a physician admission order.

213.    Additionally, on May 1, 2017, Relator asked Simmons whether some discharged patients' files that were missing physician orders could be declared a loss.  Simmons responded that the admitting physician could handwrite orders for those patients and "back date them to cover [Bayshore], because technically, [Bayshore] shouldn't have been doing any treatment on those patients whatsoever," and that this practice was "not technically the right thing to do," but Bayshore had "to do something to cover ourselves."  Ex. 12, Excerpts from Transcript of Audio Recording (May 1, 2017), at 3:12–3:22.

## G.    Defendants Employed Unqualified Directors of Rehabilitation

214.    In direct contravention of CMS' IRF PPS requirements, Defendants hired Directors of Rehabilitation who are not licensed doctors of medicine or osteopathy, including, but not limited to, the following individuals:

| Name of Employee | Name of HCA IRF | Qualifications or Degree | Dates Employed |
|---|---|---|---|
| Alicia Ancarrow | Parham Doctors' Hospital | Physical Therapist | 2014–present |
| Richie Chavez | Las Palmas Rehabilitation Hospital | M.B.A. | 2003–present |
| Heather Gervais | Parkland Medical Center | Physical Therapist | 2006–present |
| Paul Hockett | Menorah Medical Center | Physical Therapist | 2014–present |
| Karen A. Henington | Kendall Regional Medical Center | Physical Therapist | present |

| Megan Koppenhoefer | TriStar Skyline Medical Center | Physical Therapist | 2016–present |
| Seth M. Langevin | Palms of Pasadena Hospital | Physical Therapist | January 2017–present |
| Jefferson D. LeCates | TriStar Centennial Medical Center | Physical Therapist | 2012 |
| Hercules Marsella | University Hospital & Medical Center | Respiratory Therapist | present |
| Gretchen Miller | Spalding Rehabilitation Hospital | Occupational Therapist | 2015–present |
| Caroline Murphy | Research Medical Center | Speech Therapist | June 2017–present |
| Jeff R. Nasman | Ocala Regional Medical Center | Physical Therapist | 2011–present |
| Laura McCaffrey | Medical Center of Trinity | Physical Therapist | present |
| Steve Nelson | Lake City Medical Center | Physical Therapist | 2011 |
| Jan Paul | Menorah Medical Center | Speech Therapist | 2010–2014 |
| Cindy Rogers-Brunner | Doctors Hospital of Sarasota | Doctor of Education | 2000–2015 |
| Mark Rozell | Clear Lake Regional Medical Center | Non-physician | 2014-2016 |
| Kathryn Simmons | Bayshore Medical Center | Registered Nurse | November 2016–present |
| Mary Vites | Plantation General Hospital | Physical Therapist | 2014 |
| Alice D. Woods | Conroe Regional Medical Center | Physical Therapist | 2013–present |

215. Employing unqualified directors of rehabilitation in contravention of 42 C.F.R. § 412.29(g) means that Defendants did not meet the requirements for payment under the IRF PPS. As a result, all IRF claims paid by CMS to Defendants while unqualified directors of rehabilitation were employed were overpaid under the IRF PPS, and should have been paid under the IPPS.

## IX.   RETALIATION AGAINST RELATOR

216. Defendants HCA and Bayshore retaliated against Relator in response to her reports of, and efforts to stop, the ongoing fraud against CMS occurring at Bayshore and other HCA IRFs.

217.    In January of 2017, Relator began working as a Prospective Payment System ("PPS") Coordinator in Bayshore's inpatient rehabilitation department.  Relator understood that she had been offered the position as a "backup plan," until a more suitable candidate could be found.  Relator's position was on an "as-needed" part-time basis.  Relator never received a written job description, any ninety-day evaluations, or any job competency checklists for the PPS Coordinator position.

218.    As a PPS Coordinator, Relator was in charge of electronically filling out IRF PAIs and submitting them to CMS.  Relator also electronically submitted IRF claims to CMS for payment.

219.    Relator's direct supervisor as a PPS Coordinator was Kathryn Simmons, R.N. ("Simmons"), Bayshore's Director of Rehabilitation.  Simmons' direct supervisor was Mark Rozell ("Rozell"), the Vice President of Regional Operations for HCA's Gulf Coast division.

220.    In January of 2017, Relator learned that Bayshore was routinely failing to meet the 900 minutes requirement for its IRF patients because of a supposed "computer glitch."  Relator spoke with Ansu Johns ("Johns"), Bayshore's head of information technology, about this issue multiple times.  She also consulted UDS about this issue.  Relator worked with Johns to follow the flow of data and analyze the issue.  As a result, Relator learned that there was no glitch—Bayshore's therapists were simply not documenting their minutes of therapy properly.  The issue originated in a discrepancy between the number of minutes recorded in Meditech, on paper log sheets, and in a separate tracking program called Horizon Patient Profile.

221.    When Relator spoke to two physical therapists, Elizabeth Roberts and Vijo Z., about this issue, they told her that no one had informed them about the documentation

60

requirements. Relator also relayed the issue to the then-current IRF PAI Coordinator, Madalynn Harry ("Harry"), who told Relator to just record the minutes that the therapists wrote.

222.    Due to this same issue with documentation, or the lack thereof, many patient files were missing discharge "Care Tool" assessments. These assessments are used to complete required discharge IRF PAI information. As a result, many IRF PAIs submitted prior to January of 2017 contained inaccurate or incomplete information. Relator informed Rehabilitation Supervisor Jill Winter ("Winter") about this issue, but Winter responded that the therapists had been trained.

223.    In January of 2017, Relator approached Bayshore's lead therapists, including Winter, about the 900 minutes and Care Tool discharge assessment issues. As part of this effort, Relator created a new log sheet to help track therapy minutes.

224.    Beginning in January of 2017, Relator also observed that nursing staff at Bayshore were entering a wide range of scores for pressure sores, a mandatory IRF PAI quality reporting item. Relator learned that the staff were confused as to how to document pressure sores, the difference between a wound and a pressure sore, and where to enter pressure sore information in Meditech.

225.    Relator reported the nursing staff's lack of training to Harry and Simmons in January and March of 2017, respectively. Harry told Relator that the nursing staff had been properly trained. Relator planned to present information about this issue at an upcoming team meeting, but her presentation was postponed multiple times, and ultimately never occurred.

226.    In January of 2017, Relator observed that some PAIs submitted to CMS had falsely certified that patients had received influenza vaccinations. Relator learned that this had occurred because the vaccinations were not documented prior to January of 2017, meaning that prior PPS

coordinators had simply fabricated vaccination information.   When Relator asked nurses for vaccination information, they responded by asking her why she needed that information, because no one had asked them for it before.   Relator worked to ensure documentation of influenza vaccinations to make sure that this issue did not recur.   However, between January and April of 2017, some PPS coordinators still falsely stated on PAIs that patients had received influenza vaccinations at Bayshore, despite the documentation stating otherwise.

227.   Between January and June of 2017, Relator observed that some IRF PAIs that were submitted to CMS indicated that patients had no falls during their IRF stays, but Meditech showed that the patients had fallen.   Relator spoke to nurses and therapists who had made this error to ensure that it would not happen again in the future.   Relator also informed Harry, Simmons, and Winter about this problem in January and March of 2017.   The IRF PAIs previously submitted to CMS were not corrected and remain false as to whether or not patients fell during their IRF stay.

228.   In March of 2017, Relator provided Simmons with talking points and documentation about the nursing staff's lack of Meditech training.   Relator also told Simmons that, in some instances, the therapy minutes recorded in Meditech did not match the minutes recorded in UDS on PAIs.   Simmons told Relator that Relator could not speak to Winter about any errors or corrections to therapy minutes.   Simmons also informed Relator that she would take care of educating all staff, including nurses.

229.   Accordingly, Simmons provided the nursing staff with a "self-pre-test" to determine the nurses' baseline knowledge for training purposes.   Relator learned, however, that the nursing staff copied each other's answers on the test prior to submission.   Relator informed Simmons that this had occurred, but no corrective action was taken.   Additionally, Relator's

planned presentations at staff meetings regarding Meditech documentation were postponed multiple times and never occurred.

230.    Because the nursing staff were never properly trained, many IRF PAIs were submitted to CMS with bowel/bladder FIM scores that had no basis or documentation in the patients' medical record.

231.    Also in March of 2017, Relator observed that therapists were counting thirteen patients' unsupervised group breakfast time as "group therapy," as they had done before in the Fall of 2016.  Relator reported these issues to Simmons and to the supervisor of rehabilitation each time that it occurred.

232.    HCA gave a Webex on March 22, 2017, in which clinical rehabilitation specialists were instructed to rely on the condition of three muscle groups, rather than diagnostic criteria, when recommending a myopathy diagnosis.  *See* Ex. 15, March 22, 2017 Webex Transcript, at 5:9–6:4

233.    In late March of 2017, Rozell expressed to Relator that HCA "corporate" wanted its IRFs to know the procedures outlined in the Webex.

234.    In early April of 2017, Relator was completing IRF PAI information for Patient Twenty-seven, who had been admitted on April 1, 2017 when she discovered that the patient's file had no physician order for admission and no date of onset recorded.  Shortly afterwards, Relator saw the same issues in other patient files.

235.    Relator reported this deficiency to Simmons, who stated that she would speak to the admitting physician, Dr. Remington Lee.  Within forty-eight hours, Simmons gave Relator a paper document with a date of onset to use in the IRF PAI.  Not long afterwards, Relator discovered

that even more patient files lacked physician orders—including some files that had already been submitted to CMS.

236.     On April 13, 2017, Relator observed that the submitted IRF PAI for one patient was missing a discharge Care Tool assessment.  Relator immediately e-mailed Mary Kapner, the IRF PAI Coordinator at Clear Lake Regional Medical Center, about this issue.  Kapner informed Relator that a discharge Care Tool assessment had to be completed within three days of discharge. In this case, however, more than three days had passed.  When Relator approached Simmons about this issue, Simmons told Relator to enter the FIM scores anyway, regardless of the deadline. Relator refused to enter the scores late, and told Clinical Rehabilitation Specialist Kelly Hale ("Hale") that she was not entering the scores due to possible audits.

237.     Relator also spoke with Nancy Guevara ("Guevara"), Bayshore's Scribe,[24] about this issue.  Guevara instructed Relator not to fill in the FIM scores late, because if that was wrong, then Simmons would blame the issue on Relator.

238.     Relator later contacted the director of Bayshore's outpatient department, Cheryl Menter ("Menter"), about this same issue.  Menter instructed Relator that late entry of discharge assessments constituted fraud, and that she should follow the chain of command to report the issue. Accordingly, Relator communicated the issue to Rozell.  Rozell informed Relator that she should contact Rozell if Simmons instructed her to do anything that she was not comfortable with.

239.     Simmons eventually learned that Relator had spoken with Rozell, and communicated to Relator that there were "dangers" associated with telling Rozell about problems in Bayshore's rehab department.

---

[24] The Scribe's job duties include recording meeting minutes, corresponding with doctors, and coordinating with the Director of Rehabilitation.

240.    Between May 1 and May 4 of 2017, Simmons directed Relator to obtain backdated physician admission orders for patient files which lacked signed orders. *See* Ex. 12, Excerpts from Transcript of Audio Recording (May 1, 2017), at 1:17–4:11.  The patients at issue had already been discharged.  On May 1, 2017, Simmons told Relator that the physician could "handwrite [admission] orders and back date them to cover us, because technically, [Bayshore] shouldn't have been doing any treatment on those patients whatsoever," and that this practice was "not technically the right thing to do," but Bayshore had "to do something to cover ourselves."  Ex. 12, Excerpts from Transcript of Audio Recording, at 3:11–3:22.  Relator replied, "Can we just declare [the patient's stay] a loss?", and Simmons responded, "No.  The whole patient's stay would be a loss for all three patients."  Ex. 12, Excerpts from Transcript of Audio Recording, at 3:23–4:1.

241.    Relator reported this issue to Guevara, who told Relator not to use backdated physician admission orders.

242.    In Spring 2017, while working in the rehabilitation gym at Bayshore Medical Center, Relator learned that some therapists were including time spent on medical documentation as therapy time for purposes of meeting the 900 minutes requirement.  Relator informed Simmons about this issue soon after she learned of it.

243.    In May of 2017, Sandra Rule, the Head Coder Manager for HCA's Gulf Coast Division, conducted the monthly Internet-based training of all HCA coders and PPS coordinators in the region.  Relator learned during this meeting that Kingwood Medical Center's usage of CIM diagnoses was high.

244.    In May of 2017, Relator created a PowerPoint presentation for clinical rehabilitation specialists to show best practices for diagnosing myopathy, based on a review of recent medical literature.  *See* Ex. 11, Relator's Myopathy PowerPoint.  Relator created this

because she felt that the Webex did not outline proper procedures for diagnosis of myopathy. Relator sent the PowerPoint presentation to Simmons to give to Rozell.  Simmons responded that she would not send the PowerPoint to Rozell, and that Bayshore would never "get out from the bottom of the barrel" if they used the procedures outlined in the PowerPoint.  Relator understood that this comment referred to a recent quarterly performance report for IRFs in HCA's Gulf Coast Division, in which Bayshore's financial performance ranked lower than other HCA IRFs in the region.

245.    In May of 2017, Rozell told Relator that one physician previously refused to diagnose CIM without doing a muscle biopsy—the accepted procedure discussed in Relator's PowerPoint.  Rozell related that he "made" the physician change his mind about needing to do a biopsy.

246.    In June of 2017, Relator "flagged" five IRF PAIs that had been submitted to CMS notwithstanding the fact that they were missing physician admission orders.  However, Relator later discovered that someone at HCA or Bayshore had accessed her computer and removed the "flags."

247.    Also in June of 2017, in an Internet-based training conducted by HCA employee Cris Huerta, it was announced that the log sheet Relator created to track therapy minutes would no longer be utilized.

248.    On or around June 25, 2017, Dr. Remington Lee told Relator that he had been asked to admit a patient with a diagnosis of myopathy, but could not and would not do this.  The next day, however, the patient was admitted under a diagnosis of "disuse myopathy" under "other specified myopathies."  Ex. 10, Text Messages From Kathryn Simmons (March 24–June 27, 2017), at 11.

249.    On June 26, 2017, Relator sent a text message to Simmons relaying several questions from Dr. Remington Lee: "1. does UDS have criteria for CIM/CIP [myopathy]"; "2. Is there an industry standard yes or no?"; and "[3.] [C]an he do the protocol himself (not just rely on therapists)." Ex. 10, Text Messages From Kathryn Simmons, at 11.  Simmons replied to Relator's message as follows: "Dr[.] Lee can do any evaluation/protocol for CIM/CIP.  HCA had webinar on these & Kelly can forward this to [Dr. Lee] on email."  Ex. 10, Text Messages From Kathryn Simmons (March 24–June 27, 2017), at 12.

250.    In late June of 2017, Relator e-mailed her CIM PowerPoint to an HCA employee, Shannon Tucker ("Tucker").  Tucker forwarded the PowerPoint to Lisa Roberts, who had conducted the March 22, 2017 myopathy Webex.  Roberts told Relator that her PowerPoint presentation was a good educational tool, but it was ultimately never used for training therapists during Relator's employment at Bayshore.

251.    In late June of 2017, Relator also e-mailed her PowerPoint to Rozell.  Rozell told Relator that another HCA IRF in the Gulf Coast Division was compliant with the 60% Rule, and "knew how to use" myopathy diagnoses.  He directed Crystal Reiser of Kingwood Medical Center to send Relator information about diagnosing myopathy.  Reiser e-mailed a list of medical conditions to Relator, and stated that a physiatrist in the Gulf Coast Division, Dr. Grogan, "approved of this e-mail."

252.    On June 26, 2017, UDS requested five patient records for a regular audit.  Relator assisted in obtaining patient records for the audit.  Selection of the charts should be random, however, Relator observed Guevara carefully select five patient records with the least amount of problems.  Most of the patient records Relator reviewed did not meet the 900 minutes requirement.

253.    On the morning of July 7, 2017, Simmons specifically asked Relator if she could work late to assist with an "action plan" and also asked Relator if she had gone into overtime on her work that day.  Relator responded in the affirmative.

254.    On July 7, 2017, around 1:30 P.M., Simmons asked Relator to change some PAI codes for a patient who had been discharged several months prior.  Relator called UDS for guidance on this issue and was informed by Janet Patrick, CRRN, that this was impermissible. Relator relayed this requirement to Simmons immediately.  When Simmons learned that Relator had called UDS, she angrily confronted Relator, telling Relator that she had just spoken to Rozell and would not speak to him again.

255.    On July 7, 2017, around 3:00 P.M., Hale asked Relator if she could change patient diagnosis codes on an IRF PAI to a 60%-Rule-compliant diagnosis of "trauma".  The patient's previous diagnosis was not compliant with the 60% Rule.  Relator called UDS for guidance and was informed that this diagnosis could not be changed, per CMS rules.  Relator relayed this requirement to Hale.

256.    Hale became upset when hearing about this requirement.  Shortly afterwards, Simmons asked Relator again if she had gone into overtime, and Relator again responded in the affirmative.  Simmons responded that Relator should go home.  Relator asked Guevara to remove her overtime hours from Bayshore's timeslips and left Bayshore for the day.

257.    On the morning of July 10, 2017, Relator noticed that several PAIs she had already submitted to CMS and "locked" against editing had been "unlocked" and altered.

258.    Around noon on July 10, 2017, Relator was terminated from her position at Bayshore.  Relator was brought into a termination meeting with Demitra Bevins ("Bevins")—a Bayshore Human Resources employee—and Simmons.

259.    Bevins told Relator that she was being terminated because she had "caused financial distress for the hospital." Bevins did not explain how Relator's actions or performance had done this, but stated that "this is not the time to explain, it is a leadership decision."

260.    Simmons told Relator that she had made errors in entering IGCs on patient files since October of 2016. Simmons also stated that Relator had not corrected patient files that Relator had supposedly been told to correct and that Relator had received verbal warnings.

261.    Relator had, up until that point, never been notified of these purported errors, nor had the alleged errors been discussed or corrected at periodic rehabilitation team meetings. Relator also never received notice before that time of any poor job performance, nor did she receive any verbal warnings.

262.    In fact, Simmons sent several text messages to Relator in June 2017 expressing appreciation and congratulating Relator for good job performance. Simmons told Relator that she was "awesome," "a true team member," and "much appreciated." *See* Ex. 10, Text Messages From Kathryn Simmons (March 24–June 27, 2017), at 4, 7.

263.    Relator asked for the names of the specific patients whose files contained her alleged errors, but neither person present at her termination—including Simmons, who was in charge of all rehabilitation admissions—could give her that information. Simmons simply replied that the information was in her e-mail system.

264.    As a direct consequence of her reports of fraud and efforts to prevent submission of false or fraudulent claims, Relator was terminated from her position at Bayshore.

## X.   ACTIONABLE CONDUCT BY DEFENDANTS

**A.   False Claims Act**

**1.      Applicable Law**

265.    This is an action to recover damages and civil penalties on behalf of the United States and Relator Toledo arising from the false and/or fraudulent statements, claims, and acts that Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

266.    For conduct occurring before May 20, 2009, the False Claims Act ("FCA") provides, in pertinent part, that:

> any person who—
> (1)   knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false and fraudulent claim for payment or approval;
> (2)   knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . [or]
> (7)   knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the [false or fraudulent claims].

31 U.S.C. § 3729(a) (1994) (amended version at 31 U.S.C. § 3729(a)(1)).

267.    For conduct occurring on or after May 20, 2009, the FCA provides that any person who:

> (A)     knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval;
> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false and/or fraudulent claim; . . . [or]
> (G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

31 U.S.C. § 3729(a)(1), is liable to the United States for a civil penalty of not less than $10,957

and not more than $21,916 for each such claim, plus three times the amount of damages sustained

by the Government because of the false and/or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1); 28

C.F.R. §§ 85.3(a)(9), 85.5.

268.     The FCA defines "claim" as:

(A)     mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)     is presented to an officer, employee, or agent of the United States; or

(ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)     will reimburse such contractor, grantee, or other recipient for any portion of the          money or property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2).

269.     The FCA allows any person having knowledge of a false and/or fraudulent claim

against the Government to bring an action in federal district court for himself and for the United

States, and to share in any recovery, as authorized by 31 U.S.C. § 3730.

270.     The FCA also provides relief from retaliatory actions:

(1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the False Claims Act] or other efforts to stop 1 or more violations of [the False Claims Act].

(2) Relief . . . shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

271.    Based on these provisions, Relator Toledo seeks damages and civil penalties arising from Defendants' violations of the False Claims Act on behalf of the United States and on her own behalf.

### 2.    Defendants' Violations of the False Claims Act

#### a.    Presentation of False Claims (31 U.S.C. § 3729(a)(1)(A))[25]

272.    From 2007 to the present, Defendants knowingly presented, or caused the presentment of, false and/or fraudulent claims for payment or approval to the United States, including by submitting claims to Medicare for services that were not medically necessary or reasonable.

273.    IRFs may submit claims electronically using the 837 institutional claim format or may submit a claim on paper using claim form CMS-1450. Claim form CMS-1450 requires providers, including IRFs, to certify that the information is "true, accurate, and complete" and "[t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)." Ex. 8, Form CMS-1450.

---

[25] formerly 31 U.S.C. § 3729(a)(1).

274.     By creating and carrying out their fraudulent nationwide scheme, Defendants knowingly and repeatedly violated Section 3729(a)(1)(A) of the False Claims Act.

275.     Given the structure of the health care system at issue, Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the government's payment decision and was material to the government's decision to pay the claims. Medicare only pays for services that are medically necessary and reasonable and are provided in conformity with applicable statutes, regulations, and program instructions.

276.     Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which the United States contracted.  Had the United States known of Defendants' fraudulent non-compliance, which resulted in the submission of ineligible false claims for reimbursement, the United States would not have paid the claims.

277.     Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the United States was a foreseeable factor in the United States' loss and a consequence of Defendants' nationwide scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**b.     Making or Using False Records or Statements to Cause Claims to be Paid (31 U.S.C. § 3729(a)(1)(B))[26]**

278.     From 2007 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or

---

[26] formerly 31 U.S.C. § 3729(a)(2).

approved by the United States. These false records or statements include:  (1) false Attestation Statements; (2) false certifications in CMS Forms 437A and 437B, which IRFs submit in order to be paid under the IRF PPS; and (3) false certifications on PAIs, which are used as a basis for determining the appropriate Medicare payment rate for a patient.

279.    IRFs must submit an Attestation Statement on an annual basis in order to receive payment under the IRF PPS.  The Statement contains the following language:  "Based upon our personal knowledge or belief, we attest that the responses on the attached Rehabilitation Criteria work sheet (Form CMS 437A or CMS 437B) are true and correct, and that [the IRF unit or facility] has met, meets and will continue to meet all the applicable requirements for exclusion from the IPPS for the period beginning (first day of hospital's fiscal year or cost reporting period), as set out in Subpart B of 42 CFR Part 412." Ex. 9, Sample Attestation Statement, at 1.

280.    Furthermore, IRFs must submit a PAI for each patient, which is used to determine the appropriate Medicare payment rate for that patient.  PAIs contain the following certification: "I certify that the accompanying information accurately reflects patient assessment information for this patient and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information." Ex. 4, at 8.

281.    By creating and carrying out their fraudulent nationwide scheme, Defendants knowingly and repeatedly violated Section 3729(a)(1)(B) of the False Claims Act.

282.    Given the structure of the health care system at issue, Defendants' false and/or fraudulent statements or records, or causation of false and/or fraudulent statements or records, had the potential to influence the United States' payment decision and were material to the United States' decision to pay the claims.

283.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, were material, because they went to the very essence of the bargain for which the United States contracted. Had the United States known of Defendants' fraudulent non-compliance, which resulted in the submission of ineligible false and/or fraudulent claims for reimbursement, the United States would not have paid the claims under the program.

284.    Defendants' submission, or causation of submission, of false records and statements to Medicare was a foreseeable factor in the United States' loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

   c.    **Reverse False Claims (31 U.S.C. § 3729(a)(1)(G))**[27]

285.    From 2007 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements—namely, PAIs—that were material to an obligation to pay or transmit money or property to the government.

---

[27] formerly 31 U.S.C. §  3729(a)(7).

286.    An "obligation" is "an established duty," fixed or unfixed, "arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment*." 31 U.S.C § 3729(b)(3) (emphasis added).

287.    IRF PAIs are submitted in order to be paid under the IRF PPS. The PAI information is used to calculate a CMG, which, along with other factors, determines how much CMS will pay for the claim.

288.    If a facility is overpaid by CMS, such as when it is paid under a higher CMG than the CMG corresponding to the patient's actual condition, then it has an obligation to return that overpayment, generally within sixty days of the identification of the overpayment, or on the due date of any corresponding cost report. *See* 42 C.F.R. § 401.305(b).

289.    By creating and carrying out their fraudulent nationwide scheme, and by retaining overpayments based on CMGs generated from false PAIs, Defendants knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act.

290.    PAIs are material to an obligation to return money to the Government. If CMS knew that the PAI information was false and fraudulent and that HCA actually did not qualify for payment under the more lucrative IRF PPS, then it would not have paid the higher rate and would have recouped the difference between the higher amount paid under the IRF PPS versus the lower amount that should have been paid under the IPPS.

291.    Defendants' creation, use, or causation of creation or use, of false records and statements material to an obligation to pay or transmit money to the Government was a foreseeable factor in the United States' loss and a consequence of Defendants' nationwide scheme. By virtue

of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### d.      Retaliation (31 U.S.C. § 3730(h))

292.      Section 3730(h) of Title 31 of the United States Code defines whistleblower protection under the False Claims Act as follows:

> (1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the False Claims Act] or other efforts to stop 1 or more violations of [the False Claims Act].
> (2) Relief . . . shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

293.      As discussed *supra*, in violation of 31 U.S.C. § 3730, Defendants retaliated against Relator as a result of lawful acts that Relator conducted in furtherance of efforts to stop Defendants from committing False Claims Act violations.  Defendants punished Relator for her lawful and statutorily protected activity with termination.

294.      Relator has suffered both economic loss and emotional harm as a result of Defendants' retaliatory actions.

77

## XI.   CAUSES OF ACTION

**A.   Count I – False Claims (31 U.S.C. § 3729(a)(1)(A)) [28]**

295.   Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

296.   From 2007 to the present, Defendants knowingly submitted or caused the submission of false and/or fraudulent claims to the United States for payment or approval.

297.   Medicare only pays for reasonable and necessary medical services that were actually rendered and are provided in conformity with applicable statutes, regulations, and program instructions, including the requirements of the IRF PPS.

298.   IRFs may submit claims electronically using the 837 institutional claim form or may submit a claim on paper using form CMS 1450.  Form CMS 1450 requires providers to certify that the information contained within is "true, accurate, and complete," and that the submitter "did not knowingly or recklessly disregard or misrepresent or conceal material facts."  It also states that "MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

299.   Defendants submitted claims based on fraudulent myopathy diagnoses, claims for services not provided, claims based on false IRF PAIs, claims for "trial" IRF stays, claims for care which was not reasonable or necessary, and claims based on backdated physician admission orders.  This violates CMS rules, regulations, guidelines, and program instructions.  Defendants also falsely certified compliance with IRF PPS requirements and IRF regulations.

---

[28] formerly 31 U.S.C. § 3729(a)(1).

300.    Defendants' fraudulent conduct caused the United States to believe that Defendants were in compliance with the 60% Rule and other IRF PPS requirements and caused the United States to make payments to Defendants under the IRF PPS, rather than the IPPS.

301.    The United States paid the false and/or fraudulent claims.

302.    Defendants' violations of the applicable statutes, regulations, program instructions, and IRF PPS rules are material because they go to the very essence of the bargain for which the United States contracted.  Had the United States known of Defendants' fraudulent noncompliance, which resulted in submission of ineligible false and/or fraudulent claims for reimbursement, the United States would not have paid the claims under the more lucrative IRF PPS, or, in the alternative, would not have paid the claims at all.

303.    By creating and carrying out their fraudulent nationwide scheme, Defendants knowingly and repeatedly violated 31 U.S.C. § 3729(a)(1)(A) (former 31 U.S.C. § 3729(a)(1)).

304.    Given the structure of the health care system at issue, Defendant's knowing submission or causation of submission of false and/or fraudulent claims had the potential to influence the Government's payment decision and was material to the Government's decision to pay the claims.  Medicare only pays for reasonable and necessary medical services that were actually rendered and are provided in conformity with applicable statutes, regulations, and program instructions, including the requirements of the IRF PPS.

305.    Defendants' knowing presentment or causation of presentment of false and/or fraudulent claims was a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

**B.      Count II – False Records or Statements (31 U.S.C. § 3729(a)(1)(B)) [29]**

306.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

307.    From 2007 to the present, Defendants knowingly made, used, or caused to be made or used false records or statements:  (a) in order to get false and/or fraudulent claims paid or approved by the Government; or (b) that were material to false and/or fraudulent claims.

308.    These false records or statements include false Attestation Statements, false certifications in CMS Forms 437A and 437B, and false certifications on IRF PAIs.

309.    Each claim Defendants submitted for reimbursement based on the false records and statements is a false and/or fraudulent claim.

310.    The United States paid the false and/or fraudulent claims.

311.    By creating and carrying out their fraudulent nationwide scheme, Defendants knowingly and repeatedly violated 31 U.S.C. § 3729(a)(1)(B) (former 31 U.S.C. § 3729(a)(2)).

312.    Given the structure of the health care system at issue, Defendants' false records, or causation of false records, had the potential to influence the Government's payment decision and was material to the Government's decision to pay the claims.

313.    Defendants' violations of the applicable statutes, regulations, and program instructions, and subsequent misrepresentations regarding their compliance, are material because they go to the very essence of the bargain for which the United States contracted.  Had the United States known of Defendants' fraudulent noncompliance, which resulted in the submission of ineligible false and/or fraudulent claims for reimbursement, then the United States would not have paid the claims under the IRF PPS.

---

[29] formerly 31 U.S.C. § 3729(a)(2).

314.    Defendants' knowing submission or causation of submission of false records and statements to CMS had the potential to influence the government's payment decision and was material to the government's decision to pay the claims.  Medicare only pays for reasonable and necessary medical services that were actually rendered and are provided in conformity with applicable statutes, regulations, and program instructions, including the requirements of the IRF PPS.

315.    Defendants' submission, or causation of submission, of false records and statements to Medicare was a foreseeable factor in the United States' loss and a consequence of the scheme. By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## C.    Count III – Reverse False Claims (31 U.S.C. § 3729(a)(1)(G)) [30]

316.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

317.    From 2007 to the present, Defendants knowingly made, used, or caused to be made or used false records—namely, false IRF PAIs—that were material to an obligation to pay or transmit money to the United States.

318.    Defendants were paid under the IRF PPS instead of the IPPS, and they were therefore overpaid.  Defendants had an obligation to return the overpayments.

319.    PAIs are material to an obligation to return money to the Government.  If CMS knew that the PAI information was false and fraudulent and that HCA actually did not qualify for payment under the more lucrative IRF PPS, then it would not have paid the higher rate and would

_____

[30] formerly 31 U.S.C. § 3729(a)(3).

have recouped the difference between the higher amount paid under the IRF PPS versus the lower amount that should have been paid under the IPPS.

320.    By creating and carrying out their fraudulent nationwide scheme, and by retaining overpayments based on CMGs generated from false PAIs, Defendants knowingly and repeatedly violated Section 3729(a)(1)(G) of the False Claims Act.

321.    Defendants knew that the claims for payment based on the false IRF PAIs would not have been paid under the IRF PPS if CMS knew that Defendants submitted false IRF PAIs and Attestation Statements in order to qualify for payment under the IRF PPS.

322.    Defendants' creation, use, or causation of creation or use, of false records and statements material to an obligation to pay or transmit money to the Government was a foreseeable factor in the United States' loss and a consequence of Defendants' nationwide scheme.

323.    The United States has suffered substantial monetary damages due to Defendants' making, use, or causing the making or use of false records material to an obligation to pay or transmit money to the United States, and is entitled to recover treble damages.

## PRAYER FOR RELIEF

324.    WHEREFORE, Relator prays that this Court enter judgment against Defendants for the following:

    a.  Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

    b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

    c.  The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

    d.  All costs and expenses of this litigation, including attorneys' fees and costs of court; and

     e.   All other relief on behalf of Relator or the United States that the Court deems just and proper.

## D.    Count IV – Retaliation (31 U.S.C. § 3730(h))

325.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

326.    In violation of 31 U.S.C. § 3730(h), Defendants HCA Holdings, Inc. and Bayshore Medical Center, Inc. retaliated against Relator as a result of lawful acts she committed in furtherance of efforts to stop Defendants from committing violations of the False Claims Act. Defendants terminated Relator for engaging in lawful and statutorily protected acts.

327.    As a result of Relator's termination by Defendants HCA Holdings, Inc. and Bayshore Medical Center, Inc., Relator has suffered economic loss and emotional harm.

### PRAYER FOR RELIEF

328.    WHEREFORE, Relator prays that this Court enter judgment against Defendants for the following:

    a.   Two times the amount of Relator's back pay;

    b.   Interest on Relator's back pay;

    c.   Compensation for special damages sustained by Relator as a result of Defendants' actions, including, but not limited to, compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to reputation, and other pecuniary and nonpecuniary losses;

    d.   Punitive damages;

    e.   Litigation costs and attorney's fees;

    f.   Pre-judgment interest at the highest rate allowed by law; and

    g.   All other relief on behalf of Relator that the Court deems just and proper.

## XII.   DEMAND FOR JURY TRIAL

329.   Pursuant to Federal Rule 38, Relator demands a trial by jury.

## XIII.   DOCUMENTARY EVIDENCE

330.   The documentary evidence referenced herein consists of the following:

| Exhibit No. | Description | Bates Numbers |
|---|---|---|
| Appendix | Glossary of Acronyms | n/a |
| 1 | Medicare Benefit Policy Manual | CCT-R000001–CCT-R000052 |
| 2 | List of presumptive diagnosis codes for Fiscal Year 2018 | CCT-R000053 |
| 3 | Inpatient Rehabilitation Facility Patient Assessment Instrument ("IRF PAI") | CCT-R000054–CCT-R000071 |
| 4 | CMS IRF-PAI Training Manual (Oct. 1, 2012) | CCT-R000072–CCT-R000240 |
| 5 | CMS Form 437A | CCT-R000241–CCT-R000249 |
| 6 | CMS Form 437B | CCT-R000250–CCT-R000255 |
| 7 | Follow-up Information from the November 12, 2009 Provider Training Call | CCT-R000256–CCT-R000271 |
| 8 | Form CMS-1450 | CCT-R000272–CCT-R000273 |
| 9 | HCA's Form 10-K for Fiscal Year 2016 | CCT-R000274–CCT-R000275 |
| 10 | Text Messages From Kathryn Simmons (March 24–June 27, 2017) | CCT-R000276–CCT-R000289 |
| 11 | Relator's Myopathy PowerPoint Presentation | CCT-R000290–CCT-R000312 |
| 12 | Excerpts from Transcript of Audio Recording (May 1, 2017) | CCT-R000313–CCT-R000319 |
| 13 | Appendix O to 2016 IRF PAI training manual | CCT-R000320–CCT-R000325 |
| 14 | IRF PAI Training Manual § 9 (2016) | CCT-R000326–CCT-R000334 |
| 15 | March 22, 2017 Webex Transcript | CCT-R000335–CCT-R000362 |
| 16 | American Family Physician article entitled "Evaluation of the Patient with Muscle Weakness" | CCT-R000363–CCT-R000372 |

Respectfully submitted,

_____

Joel M. Androphy
D.C. Bar No. 999769
TX State Bar No. 01254700

Janis G. Gorton
Pending *pro hac vice* admission
TX State Bar No. 24071063
Rebecca L. Gibson
Pending *pro hac vice* admission
TX State Bar No. 24092418

BERG & ANDROPHY
1875 I Street Northwest
Fifth Floor
Washington, DC 20006
Telephone (800) 561-5670
Facsimile (713) 529-3785

Counsel for Relator Clarisse Christine Toledo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 19, 2017, a true and correct copy of this Original Complaint was delivered to the United States Attorney's Office for the District of Columbia and the Department of Justice in Washington, D.C. via electronic mail and via certified U.S. mail.


_____
Joel M. Androphy

I

**Glossary of Acronyms**

**CIM**: Critical Illness Myopathy

**CMG**: Case Mix Group

**CMS**: Centers for Medicare & Medicaid Services

**DRG**: Diagnostic Related Group

**FI**: Fiscal Intermediary

**FIM**: Functional Independence Measure

**HHS**: Department of Health & Human Services

**IGC**: Impairment Group Code

**IPPS**: Inpatient Prospective Payment System

**IRF**: Inpatient Rehabilitation Facility

**IRF PAI**: Inpatient Rehabilitation Facility Patient Assessment Instrument

**IRF PPS**: Inpatient Rehabilitation Facility Prospective Payment System

**MAC**: Medicare Administrative Contractor

**MRC**: Medical Research Council

**PAI**: Patient Assessment Instrument

**PPS**: Prospective Payment System

**RIC**: Rehab Impairment Classification

**UDS**: Uniform Data Systems